# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BARTON CRAIG HARVEY, Derivatively on Behalf of Nominal Defendant STAMPS.COM, INC., | |
| Plaintiff, | Case No. 1:19-cv-01861-UNA |
| v. | VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT |
| KENNETH T. MCBRIDE, MOHAN P. ANANDA, DAVID C. HABIGER, G. BRADFORD JONES, THEODORE R. SAMUELS, II, KATE ANN MAY, KYLE HEUBNER, JEFFREY CARBERRY, SEBASTIAN BUERBA, JOHN ROLAND CLEM, MATTHEW LIPSON, and AMINE KHECHFE, | JURY TRIAL DEMANDED<br><br>**Public Redacted Version** |
| Defendants, and | |
| STAMPS.COM, INC., a Delaware Corporation, | |
| Nominal Defendant. | |

Plaintiff Barton Craig Harvey ("Plaintiff"), by and through his undersigned counsel, brings this action derivatively on behalf of Stamps.com Inc. ("Stamps.com" or the "Company"), pursuant to Sections 10(b), 20(a) and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b), 78t(a) and 78t-1, Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5 and Delaware common law.

Plaintiff alleges the following based upon personal knowledge as to himself and his own acts and upon information and belief as to all other matters.  Plaintiff's information and belief is based on the ongoing investigation of his undersigned counsel, which includes reviewing internal corporate documents obtained from the Company pursuant to a 8 *Del. C.* § 220 and reviewing publicly available information, including filings by Stamps.com with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits and matters of public record.  Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only by the Defendants or are exclusively within their custody or control.  Plaintiff believes that substantial additional evidentiary support is likely to exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     PRELIMINARY STATEMENT

1.     This is a shareholder derivative action brought on behalf of and for the benefit of Stamps.com, against certain of its officers and/or directors named as defendants herein seeking to remedy their breaches of fiduciary duties, insider trading, unjust enrichment, waste of corporate assets, and violations of the Exchange Act during the period of February 29, 2016 to the present (the "Relevant Period").

2.     At bottom, this derivative action arises out of Stamps.com's directors and senior officers' furtive implementation and employment of an unsustainable business practice premised on improperly abusing the United States Postal Service's ("USPS") postage reseller program (the "Reseller Program") (defined below); approving acquisitions of companies on unfair terms thereby further abusing the Reseller Program; engaging in insider trading while in possession of material, non-public information relating to the Company's business practice; knowingly approving hundreds of millions of dollars of share repurchases at inflated prices; and preparing and disseminating materially false and misleading information regarding the Company's unsustainable business practice.

3.     Founded in 1996, Stamps.com provides Internet-based mailing and shipping services to customers.  In 1999, Stamps.com received regulatory approval from the Postal Service to sell USPS postage over the Internet.

4.     At all relevant times, Stamps.com's relationship with the USPS was significant.  In fact, the USPS entered into a commission agreement (the "USPS Commission Agreement") with Stamps.com whereby the Company received a set percentage of the USPS revenues (and growth) generated on the Company's website.  Notably, the USPS Commission Agreement contained an exclusivity provision, meaning that Stamps.com's customers could only purchase USPS postage, rather than postage from other private companies such as FedEx or UPS.

5.     Over the last two decades, the Company – due largely in part to its relationship with the USPS – grew into a major provider of Internet-based mailing and shipping solutions in the United States. The Company failed to acknowledge or otherwise recognize, however, that it was able to achieve such success by improperly abusing the Reseller Program.

6.     The Reseller Program was designed by the USPS as a way to increase shipping volumes. The USPS contracted with third-parties (*i.e.* "Resellers") via negotiated service agreements ("NSA"). Pursuant to an NSA, the Reseller had a contractual right to purchase USPS postage at a steep discount and then "resell" that postage to customers for a profit. The difference between the Reseller's purchase price and the Reseller's sale price is known as the "Reseller Spread."

7.     Because selling discounted postage to existing customers would cannibalize USPS's existing revenue stream, the USPS made clear to Resellers that they could not offer discounted Reseller rates to pre-existing USPS customers and that companies solely offering USPS postage, such as Stamps.com, should not participate in the Reseller Program because it would lead to cannibalization of USPS revenues.

8.     Nonetheless, the Company's directors and officers schemed to profit from the Reseller Program by entering into undisclosed back-end agreements with Resellers. Through these back-end agreements, Stamps.com was able to recoup all

or most of the Reseller Spread by merely shifting preexisting USPS customers into the Reseller Program – while simultaneously profiting under the USPS Commission Agreement.

9.     The Company's directors and officers plainly knew that Stamps.com's abuse of the Reseller Program threatened the Company's ongoing and essential relationship with the USPS, making the business strategy unsustainable and harmful to the Company.

10.     In fact, in or around 2016, market commentators began to cast doubt on the Company's abusive tactics.  Nonetheless, Stamps.com's Board of Directors (the "Board") continued to approve and/or conceal the Company's unsound practices.  Indeed, the Board approved Defendant McBride's false and misleading statements concealing the scope of the Company's misconduct.

11.     Rather than cease or rectify the situation, the Company's officers and directors sold approximately $190 million worth of stock (avoiding $150 million in losses) and approved a massive increase to the Company's share repurchase plan. Notably, Defendants knowingly caused the Company to repurchase $383.7 million with of its own shares at drastically inflated prices, costing the Company over *$279 million*.

12.     Stamps.com's agreement with the USPS was ultimately terminated on December 31, 2018.  Stamps.com, however, did not announce the termination of its exclusive relationship with the USPS until February 21, 2019.

13.     The Company's announcement stunned the market.  Stamps.com had its worst single-day performance in its history as shares plummeted $114.43 (nearly 58%) to a close price of $83.65 per share on February 22, 2019.

14.     Then, on May 8, 2019, Stamps.com announced that the USPS was in negotiations with Resellers to reform the Reseller Program, likely ending the Company's ability to generate revenues from its Reseller scheme that bilked hundreds of millions of dollars from the USPS.  On this news, the Company's stock dropped another 56%, from $83.39 to $36.90.

15.     By driving away the USPS, the Company gave up, according to its own Form 10-K filed with the SEC on March 1, 2019 (the "2018 10-K"), the primary driver of its revenue: "services and transactions related revenues from our USPS mailing and shipping services," which accounted at times for approximately *87 percent* of the Company's revenue.

16.     Accordingly, Plaintiff brings this action on behalf of and for the benefit of Stamps.com to seek redress for Defendants' violations of the Exchange Act, breaches of fiduciary duties, insider trading, unjust enrichment, and waste of corporate assets.

## II.    JURISDICTION AND VENUE

17.    Pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of sections 10(b), 20(a) and 20A of the Exchange Act.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

18.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because the Company is incorporated in this District.

19.    In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets

## III.    PARTIES AND RELEVANT NON-PARTIES

### A.    Plaintiff

20.    Plaintiff Barton Craig Harvey is a shareholder and beneficial owner of 100 shares of Stamps.com Inc. common stock.

### B.    Nominal Defendant

21.    Nominal Defendant Stamps.com is a Delaware corporation with its principal offices located at 1990 E. Grand Avenue, El Segundo, California 90245. Stamps.com provides online mailing and shipping services in the United States and

Europe.  The Company's stock trades on the NASDAQ exchange under the symbol "STMP."

### C.   Director Defendants

22.    Defendant Kenneth T. McBride ("McBride") has served as the Company's Chief Executive Officer ("CEO") and a member of the Board of Directors ("Board") since August 2001.  Beginning in 1999, McBride has held various positions at the Company: as President from 2001 until January 2012; as Chief Financial Officer from August 2000 to January 2004; and as senior director and vice president of finance from 1999 to 2000.  McBride has also been chairman of the Company's Board since January 2012.  McBride's total compensation from Stamps.com for 2018 was $2,697,342.[1]  McBride signed each of the Company's Form 10-Ks for the years ended December 31, 2015 through December 31, 2017 and made other false and misleading statements as alleged herein.

23.    Defendant Mohan P. Ananda ("Ananda") is a co-founder of Stamps.com and has served as a director of the Company since 1998.  Defendant Ananda is a member of the Audit, Compensation and Nominating Committees.  Ananda's total compensation from Stamps.com for 2018 was $582,665.[2]  Ananda

---

[1] Stamps.com, Proxy Statement (Schedule 14A), at 25 (April 30, 2019) ("2019 Proxy").
[2] *Id.* at 9.

signed each of the Company's Form 10-Ks for the years ended December 31, 2015 through December 31, 2017.

24.     Defendant David C. Habiger ("Habiger") has served as a director of the Company since 2016.  Defendant Habiger is a member of the Compensation Committee.   Habiger's  total  compensation  from  Stamps.com  for  2018  was $580,665.[3]  Habiger signed each the Company's Form 10-Ks for the years ended December 31, 2016 and December 31, 2017.

25.     Defendant G. Bradford Jones ("Jones") has served as a director of the Company since 1998.  Defendant Jones is the Chair of the Audit Committee and a member  of  the  Nominating  Committee.    Jones's  total  compensation  from Stamps.com for 2018 was $588,065.[4]  Jones signed each of the Company's Form 10-Ks for the years ended December 31, 2015 through December 31, 2017.

26.     Defendant  Theodore  R.  Samuels,  II  ("Samuels")  has  served  as  a director of the Company since 1998.  Defendant Samuels is a member of the Audit Committee.    Samuels's  total  compensation  from  Stamps.com  for  2018  was $576,065.[5]  Samuels signed the Company's Form 10-Ks for the years ended December 31, 2016 and December 31, 2017.

---

[3] *Id.*
[4] *Id.*
[5] *Id.* at 9.

27.    Defendant Kate Ann May ("May") has served as a director of the Company since March 2019.  May has also served as the Chief Executive Officer of the Company's ShippingEasy subsidiary since Stamps.com acquired the company on July 1, 2016, and the Board determined that she was an executive officer of the Company on July 25, 2018.  In connection with the Company's acquisition of ShippingEasy, the Company entered into a Management Incentive Plan, which named May as a Participant Representative.  Under the Management Incentive Plan, May received 10,892 shares, 28,319 shares and 4,356 shares of the Company's common stock in each of March 2017, March 2018 and March 2019 valued at approximately $1,293,980, $5,646,921 and $380,042, respectively, on the dates of issuance.  Given May's ongoing role as an executive of the Company's ShippingEasy subsidiary, as well as her recent payouts relating to the acquisition of ShippingEasy, the Company admits in its public filings that May is not independent.

28.    Defendants McBride, Ananda, Habiger, Jones, McBride, Samuels, and May are collectively referred to herein as "Director Defendants" or the "Board."

**D.    Officer Defendants**

29.    Defendant Jeffrey Carberry ("Carberry") has served as the Company's Chief Financial Officer since July 31, 2017.  Previously, Carberry was the

Company's Vice President of Finance from April 2014 to July 2017. Carberry signed the Company's Form 10-K for the year ended December 31, 2017.

30.    Defendant Kyle Huebner ("Huebner") served as the Company's President from July 31, 2017 to May 2, 2019. Prior to July 31, 2017, Huebner had been the Company's Chief Financial Officer since 2004 and the Company's Co-President since January 13, 2012. Previously, Huebner was the Company's Vice President of Marketing from 2001 to 2004, Vice President of Corporate Strategy from 2000 to 2001, and Senior Director of Corporate Strategy from 1999 to 2000. Huebner signed the Company's Form 10-Ks for the years ended December 31, 2015 and December 31, 2016 and he also made other false and misleading statements during conference calls as alleged herein.

31.    Defendant Sebastian Buerba ("Buerba") has served as the Company's Chief Marketing Officer since January 2012. Previously, Buerba served as the Company's Vice President of Marketing from April 2009 to January 2012, Director of Marketing from April 2006 to April 2009, and as Product Strategy Manager from July 2004 to April 2006.

32.    Defendant John Roland Clem ("Clem") has served as Chief Product Officer since July 2016. Previously, Clem served as the Company's Chief Product and Strategy Officer from January 2012 to July 2016, Vice President of Product and Service Operations from March 2006 to January 2012, Director of Marketing

from March 2004 to February 2006, and Director of Corporate Strategy from March 2003 to February 2004.

33.     Defendant Matt Lipson ("Lipson") has served as the Company's Chief Legal Officer and Secretary since January 15, 2018.  Previously, Lipson served as the Company's Vice President and General Counsel from May 2017 to January 2018, Deputy General Counsel from April 2016 until May 2017, Associate General Counsel from 2006 until April 2016, and Senior Counsel from 2002 through 2006.

34.     Defendant Amine Khechfe ("Khechfe") has served as the Company's Chief Strategy Officer since July 2016.  From November 18, 2015 to July 20, 2016, Khechfe served as General Manager of Endicia, the Company's wholly owned subsidiary.  ███████████████████████████████████████████ ████████████████████████████████.

35.     Defendants McBride, Carberry, Huebner, Buerba, Clem, Lipson and Khechfe are referred to collectively herein as the "Officer Defendants."

    **E.**     **Relevant Non-Parties**

       **1.**     **Stamps.com Subsidiaries**

36.     Endicia is a PC Postage Company (defined below) that provides access to USPS postage to high volume shippers.  Endicia was acquired by Stamps.com in March 2015.

37.     ShipStation is a web-based shipping platform designed to help online retailers process, fulfill, and ship their orders from over 40 popular marketplaces and shipping carts, including eBay, Amazon, Shopify, BigCommerce, Volusion, Squarespace and others.  ShipStation was acquired by Stamps.com on June 10, 2014.

38.     ShipWorks is a web-based shipping platform that offers monthly subscription based e-commerce shipping software to online sellers. ShipWorks solutions integrate with over 50 popular online sales and marketplaces systems including eBay, PayPal, Amazon, Yahoo! and others.  ShipWorks was acquired by Stamps.com on August 29, 2014.

39.     ShippingEasy is a web-based shipping platform that integrates with eCommerce platforms, allowing customers to download their orders, track shipments and order status, print labels, and save on postage.  ShippingEasy was acquired by Stamps.com on June 21, 2016.

## 2.     USPS Resellers

40.     Express 1 is a registered Reseller pursuant to the USPS Reseller Program.  Express 1 is a sales and support business partner for the USPS that provides discounted shipping rates and technology solutions to lower volume USPS shippers.

41.    IntuiShip (aka USS) is a registered Reseller pursuant to the USPS Reseller Program.  IntuiShip offers USPS postage products for online sellers and small/medium size businesses.

42.    Parcel Partners is a registered Reseller pursuant to the USPS Reseller Program.  Parcel Partners offers USPS postage products for online sellers and small/medium size businesses.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Company Background

43.    Founded in 1996, Stamps.com provides Internet-based mailing and shipping services to customers.   In 1999, Stamps.com became the first USPS approved PC Postage[6] vendor.

44.    From 1999 to approximately 2009, Stamps.com, catering mostly to small and home businesses, derived most of its revenue from charging customers a subscription fee for use of its online platform.

45.    Over the last two decades, the Company – due largely in part to its relationship with the USPS – grew into a major provider of Internet-based mailing and shipping solutions in the United States.

---

[6] PC Postage refers to a USPS-approved third-party vendor software that mailers can use to pay for and print their postage using a computer, printer, and internet connection.

14

46.     Stamps.com's relationship with the USPS was indeed critical to its success, at times accounting at times for approximately ***87 percent*** of the Company's revenue.

47.     As alluded to above, and as further explained below, Stamps.com entered into the USPS Commission Agreement whereby the Company would receive a set percentage of the USPS revenues (and growth) generated on the Company's website.

48.     The USPS Commission Agreement, or incentive agreements, were one of two initiatives established by the USPS to incentivize third-party companies to assist it in increasing shipping volumes.   The other initiative, known as the Reseller Program, was not intended to be utilized by Stamps.com.   Nonetheless, Stamps.com profited from the Reseller Program by entering into clandestine back-end agreements with Resellers – thereby consciously jeopardizing the Company's pivotal relationship with the USPS.

**B.     USPS Incentive Agreements and Reseller Programs**

**1.     The USPS Commission Agreement[7]**

49.     As mentioned above, Stamps.com entered into the USPS Commission

Agreement[8] whereby the Company received a set percentage of the USPS revenues

(and growth) generated on the Company's website.   Specifically, per the USPS

Commission Agreement, Stamps.com and the USPS agreed ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████.

50.     Under the terms of the USPS Commission Agreement, the Company

was to earn an incentive fee.   ████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████.

---

[7] Although the USPS Commission Agreement and subsequent amendments thereto
were material to the Company's revenues, the Company did not disclose any of the
terms of the Commission Agreement publicly to investors.
[8] STMP-HR220 01105.

51. ████████████████████████████████████████

██████████████████████████████████████.

52. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████

53.     Notably, the USPS Commission Agreement included an exclusivity provision prohibiting the Company from working with competing carriers.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

## 2.     The USPS Reseller Program

54.     Following the demise of DHL U.S. Express's ("DHL") domestic shipping, the USPS developed the "Reseller Program" to recruit new high volume shippers.  To this end, the USPS enlisted third-parties (*i.e.* Resellers) to assist in its

efforts.  Essentially, Resellers acted as sales representatives for the USPS, helping to recruit new customers and sell postage.

55.     Three companies dominated the Reseller market: Express1, Parcel Partners, and USS (d/b/a IntuiShip).   Under the Reseller Program, the USPS entered into a customized, negotiated contract with each Reseller (an "NSA") that provides discounted rates to the Reseller that vary based on each agreement.  NSAs typically worked by granting the Reseller a contractual right to (1) buy postage from the USPS at a steep discount, and then (2) "resell" that postage to the Reseller's customers at a higher rate.   The rate difference between what the Reseller paid to USPS for the postage and what it resold the postage for to its customers is called the "Reseller Spread," which is how the Reseller earns revenue for its efforts in sourcing and securing new USPS customers.

56.     Generally speaking, the discounted rates at which Resellers bought USPS postage were far more favorable than the USPS's retail or commercial rates. Although the terms of NSAs are not public, reports from market commentators indicate that NSAs provided for tiered pricing—*i.e.*, the more USPS volume the Reseller secured, the less the Reseller would have to pay the USPS for the aggregate postage.  The tiered pricing was intended to allow Resellers to provide greater discounts to higher-volume shippers.   As a result, Resellers were incentivized to meet or exceed certain volume requirements in order to qualify for

the lowest postage rates under their respective NSAs for the benefit of their customers.

57.   Because the Reseller Program was originally designed to acquire former DHL customers (*i.e.*, non-USPS customers), the USPS prohibited Resellers from calling on any pre-existing USPS customers to offer them discounted rates pursuant to an NSA.   The purpose behind this exclusion is clear on its face: if Resellers were permitted to call on current USPS customers, they would be offering steep discounts to customers already using USPS, thereby eating into USPS revenues.   Thus, the USPS reasonably held that the Resellers should only offer the discounts available under their NSAs to customers using competing carriers (primarily, FedEx and UPS).

58.   Similarly, according to market commentators, the USPS took the position that the PC Postage providers (*e.g.*, Stamps.com and Endicia) were not meant to participate in the Reseller Program, because Stamps.com and Endicia were already long-term partners with the USPS, and therefore most (if not all) of their customers were preexisting USPS customers.   Several key facts bolster this reasoning.   For one, Stamps.com never applied for nor received its own NSA from the USPS pursuant to the Reseller Program.   Further, Defendant Huebner admitted during the Company's Q2 2016 earnings call that "in terms of [Stamps.com's] own NSA [pursuant to the Reseller Program], traditionally, USPS has really viewed

[Stamps.com] as a technology partner and they've really chose to compensate [the Company] for that—our role as a technology partner."

**C.      Stamps.com's Directors and Officers Approve an Unsustainable Business Model Premised on Improperly Abusing the Reseller Program**

**1.      Synopsis of Stamps.com's Reseller Scheme**

59.      Resellers began to attract Stamps.com's customers because they were able to charge customers less to ship packages.   Faced with this conundrum, Stamps.com realized that it could substantially increase its profitability if it too was able to take advantage of the Reseller Program.   To this end, Stamps.com struck secret backend agreements with Resellers whereby Stamps.com would place a substantial portion of its customers into the Reseller Program through the Resellers, allowing the Company to profit both directly from the USPS and indirectly from Resellers through receipt of an undisclosed and unknown portion of the Reseller Spread.   This practice, however, was at odds with the USPS's mandates that PC Postage providers not offer customers Reseller discounts and that the Reseller Program existed only to capture new customers not already using the USPS.

60.      Indeed, the Company was not allowed to participate in the Reseller Program due to the very real risk that Stamps.com would merely transfer pre-existing USPS customers into the Reseller Program to profit at the expense of the

USPS (*i.e.*, cannibalize USPS revenues).   However, by entering into back-end

agreements with the Resellers, Stamps.com was able to circumvent the USPS.  Not

only did the Company blatantly take advantage of the Reseller Program at the

expense of the USPS, it placed its relationship with its most important partner, the

USPS, in jeopardy.

> **2.      Stamps.com Launches its Clandestine Scheme of Acquiring
> New Companies to Abuse the Reseller Program and Take
> Advantage of the USPS**

61.    An appendix to an October 25, 2016 Board presentation ███████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████

62.    As demonstrated in the following Board presentation slide, ████

██████████████████████████████████████████████████████████

███████████████████████████████████



63.    Based on the foregoing slide, ███████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████.

64.    The Board and the Officer Defendants also  ███████████

████████████████████████████████████████████████████

███████████████████████████████████████.

65.    To this end, the Board and Officer Defendants  ███████████

███████████████████████████████████████████████████:



66.     The Board presentation ████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████

67.     The following  presentation  slide  ████████████████████
████████████████████████████████████



68.    The Board and Officer Defendants' 

69.    Despite  the  legitimate  risks  involved,  the  Board  and  the  Officer

Defendants

.

### i.    ShipStation

70.    On June 10, 2014, Stamps.com announced that the Board had approved the acquisition of Auctane, LLC, which operates ShipStation, for $50 million in cash plus performance-linked earn-out consideration of up to 768,900 shares of Stamps.com stock.   During the July 30, 2014 earnings call, McBride stated, "In our high volume shipper area, we're continuing to ramp up our efforts. The Stamps.com and ShipStation platforms offer great solutions for high volume shippers such as warehouses, fulfillment houses, e-commerce shippers, large retailers and other types of high volume shippers."

### ii.    ShipWorks

71.    Then, on August 29, 2014, the Company announced that the Board had approved the acquisition of Interapptive Inc., which operates ShipWorks. ShipWorks offers monthly subscription based e-commerce shipping software that provides simple, powerful and easy to use solutions for online sellers.   ShipWorks solutions integrate with over 50 popular online sales and marketplaces systems including eBay, PayPal, Amazon, Yahoo! and others.

### iii.    Endicia

72.    On March 20, 2015, the Board approved the acquisition of Endicia for $215 million in cash.   The Endicia acquisition was consistent with the Company's plans to acquire USPS volume at any cost.   Indeed, an August 2, 2016 Board presentation illustrates that ███████████████████████████████

███████████████████████████████████[9]   Further, an October 25, 2016 Board

presentation indicates █████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████.[10]   Moreover, a February 14, 2017 Board presentation

demonstrates that ██████████████████████████████████████████████

███████████████████████.[11]

73.   The Board and Director Defendants knew ██████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████.

### iv.   ShippingEasy

74.   On July 1, 2016 Stamps.com completed its purchase of ShippingEasy

for approximately $55 million.   An October 25, 2016 Board presentation slide

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████[12]

---

[9] STMP-HR220 01231 at 01244.
[10] STMP-HR220 01130 at 01144.
[11] STMP-HR220 00933 at 00955.
[12] STMP-HR220 01130 at 01141.

75.    As demonstrated in the following appendix to the October 25, 2016

Board presentation, ████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

████████████████████████████████.[13]

████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

### 3.    Reseller Economics

76.    These acquisitions were ████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████.

---

[13] STMP-HR220 01130 at 01230.

77.     Following the acquisitions of ShipWorks, ShipStation, Endicia and ShippingEasy, the Board received ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████. [14]

████████████████████████████████████████████████

78.     For example, the above slide, taken from the April 25, 2017 Board Materials, shows, ████████████████████████████████

─────────────────────────

[14] STMP-HR220 00805 at 00839.



.[15]

### 4.   Stamps.com's Service Revenue Skyrockets as a Result of its Abuse of the Reseller Program

79.     From 2009 to 2014, Stamps.com recognized consistent (albeit limited) growth in service revenue ranging from 5% to 17%, which included revenues from subscription fees and commission paid by USPS and Resellers.  But following the creation of the Reseller Program, Stamps.com's revenues increased by 53% in a single year in 2015 and then continued on an accelerated growth trajectory in subsequent years.   A summary of the Company's service revenue figures and service revenue growth is provided in the following chart:

---

[15] *Id.* at 00840.

| Fiscal Year Form 10-K[16] | Service Revenue | YOY % Growth |
|---|---|---|
| 2009 | $61.6 million | 10% |
| 2010 | $64.6 million | 5% |
| 2011 | $75.5 million | 17% |
| 2012 | $88.2 million | 17% |
| 2013 | $99.0 million | 17% |
| 2014 | $115.7 million | 17% |
| 2015 | $176.7 million | 53% |
| 2016 | $313.1 million | 77% |
| 2017 | $411.3 million | 31% |
| 2018 | $530.7 million | 29% |

80.    While the true reason for the substantial increase in service revenue growth was not disclosed in 2015 or thereafter, the Company did disclose in 2016, for the first time, how it earned service revenue.  The 2015 Form 10-K, filed with the SEC on February 29, 2016 ("2015 10-K"), and signed by Defendants McBride, Jones, Ananda and Huebner, stated as follows:

> For service revenue, we earn revenue in several different ways: (1) customers may pay us a monthly fee based on a subscription plan; (2) customers may qualify under our USPS partnership to have their service fees waived or refunded and then we are compensated directly by the USPS; (3) customers may pay us a fee per shipping label printed; *(4) we may earn compensation by offering customers a discounted postage rate that is provided to the customers by our*

---

[16] Data compiled from the Company's Form 10-Ks, which were signed by each of the Company's then-directors.

***partners; and (5) we may earn other types of revenue shares or other compensation from specific customers or partners.***[17]

81.     The above disclosure was misleading because the Defendants did not

disclose or provide ████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████.

82.     During the Company's first quarter 2016 earnings call, McBride

offered another vague statement about the ways Stamps.com monetizes postage

volume.  On that call, McBride stated:

> Average monthly revenue per paid customer, or ARPU [average revenue per paid user], was $40.65 in the first quarter and that was up 58% versus the first quarter of 2015. The growth in ARPU benefited from continued growth in the shipping business, including ***positive contributions from the traditional high volume shipping area as well as from all of our acquisitions, Endicia, ShipStation and ShipWorks***. Specifically, the growth in ARPU has been driven by the higher ARPU typically associated with higher volume shippers. All three of our acquisitions ShipStation, ShipWorks and Endicia have higher ARPU than our historical average. ***And also, ARPU is now directly correlated with the postage growth owing to the various ways we are now able to monetize the postage volume.***

83.     McBride's statement was materially false and misleading because he

████████████████████████████████████████████████████████████

---

[17] 2015 10-K at 33 (emphasis added).

**5.** ████████████████████████████████

84.     Almost immediately after the acquisitions of Endicia, ShipStation and ShipWorks, Stamps.com became aware that the USPS was beginning to clamp down on revenue cannibalization through Resellers and their manipulation of the NSAs.

85.     The USPS focused on IntuiShip, along with its third-party sales affiliate, Move Method.[18]   Move Method was under USPS scrutiny for funneling existing USPS customers through IntuiShip's NSA.   On February 10, 2016, Doreen Rathburn, Business Alliances Manager at USPS, sent an internal email concerning potential cannibalization of existing USPS customers, stating "They clearly know where I stand on cannibalizing existing business and have stated that was not the intent here."   Shortly thereafter, Robert Ross ("Ross"), co-founder of

---

[18]   According to its website, MoveMethod employs consultants "to support organizations with streamlining logistics operations to march their customer service and cost savings initiatives."   Its shipping "partners" include Stamps.com, Endicia and IntuiShip.   Information is limited regarding Move Method's relationship with IntuiShip. Upon information and belief, Move Method acted as a third-party sales agent that assisted those companies with sourcing clients for the Reseller Program.
*See* http://movemethod.com (last visited on September 9, 2019).

IntuiShip, confirmed to the USPS that IntuiShip was committed to preventing this practice from recurring, although in fact it continued the practice.

86.    Then, on August 2, 2016, Cliff Rucker ("Rucker"), USPS Vice President of Sales, sent a letter to IntuiShip regarding the USPS's investigation into the potential misuse of IntuiShip's NSA in a manner that cannibalized existing USPS business.  The letter concluded by stating: "If it is determined that this is the case, your NSA is subject to termination due to violation of the agreed upon terms of the agreement."

87.    Stamps.com became aware that the USPS was scrutinizing IntuiShip and Move Method for abuse of the Reseller Program.  On July 16, 2016, Rucker sent an email to Stamps.com executives Candi Booth and Amine Khechfe – both of whom had previously worked at Endicia – alerting them that USPS personnel were being instructed to investigate Move Method for cannibalizing USPS business under the Reseller Program and that USPS was prepared to send "a letter to cancel the contract."

88.    On October 25, 2016, the Stamps.com Board of Directors was informed that, ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

████████████  █████████████████████████

███████████████████████████████████████

██████████████████████

### 6.     Market Commentators Begin to Probe the Company's Misconduct, But the Board Oversees the Issuance of False Denials

89.    In or around July 2016, following the above investigations into Reseller abuse, market commentators began to raise questions publicly about the Company's remarkable performance over the past few years.

90.    For example, on July 8 and 12, 2016, the Capitol Forum[20] issued two reports to its subscribers concerning Stamps.com's postage arbitrage scheme. The July 8 report was entitled "Stamps.com: *Reliance on Negotiated Service Agreements with USPS, Relationship with IntuiShip Leaves Stamps.com with Significant Regulatory Risk; USPS Can Terminate NSA with 30 Days' Notice if Agency Finds Abuse.*"[21]    Citing industry sources, including within the Postal

---

[19] STMP-HR22001130 at 01196.

[20] According to its website, the Capitol Forum is an investigative news and legal analysis company dedicated to informing policymakers, investors, and industry stakeholders on how policy affects market competition. The Capital Forum is a subscription-based service, costing subscribers approximately $20,000 per year to access any investigative reports.

[21] The July 12, 2016 Capitol Forum report is not publicly available.

Regulatory Commission, the Capitol Forum report described Stamps.com's postage scheme, highlighted the reasons why it was abusive, and called out Stamps.com's "partnership" with IntuiShip.   The report claimed that abusive Reseller practices by these companies were cannibalizing USPS revenues and concluded that regulatory scrutiny could have a detrimental impact on Stamps.com's revenues.   Another investigative analysis company, Prescient Point, issued a report concluding that "the reseller program NSAs benefitting STMP are at a high risk of cancellation" and that the USPS Officer of the Inspector General ("OIG") would open an investigation, which the OIG in fact did a year later.

91.   Presentations made to the Board from 2016 to 2018 show that ████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████[22]

92.   For instance, On July 27, 2016, the Board held a meeting at which Defendants Ananda, Jones, McBride, and Huebner were present. According to the minutes of the July 27, 2016 meeting, ████████████████████████████████████

_____

[22] STMP-HR220 01231 (Aug. 2, 2016) at 01243; STMP-HR220 00933 (Feb. 14, 2017) at 01037; STMP-HR220 00805 (Apr. 25, 2017) at 00914; STMP-HR220 00559 (Jul. 25, 2017) at 00644; and STMP-HR220 00005 (Feb. 16, 2018) at 00103.

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

93.     The morning after the July 27, 2016 meeting, the Company held its second quarter 2016 earnings call.  On that call, McBride disclosed to the market a number of false and misleading statements regarding the Reseller Program, ████ ██████████████████████████████████████████.

94.     For instance, McBride explained that "our business with IntuiShip represents less than 10% of our total revenue."  In response, an analyst asked, "what percentage of your revenues today come from resellers in the form of, kind of the referral fees or revenue share arrangements that you have in place?" McBride dodged the question, stating "we wanted to provide some insight into some of the metrics in the business and in order to help explain the reseller program, we don't like to disclose specific partner information beyond that, and there is very confidential competitive information so we – ***IntuiShip is less than 10% and that's the main bullet point we like put out there***." ██████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████.

95.     McBride further stated:

The third main negative argument being advanced in the investor community, which falls on the prior arguments, is that once the USPS has investigated the reseller program, they will then determine that it is not helping you USPS growth and it is solely cannibalizing existing

volume. This argument is based on a single data point, which is that Priority Mail volume growth in the first calendar quarter of 2016 was flat. This argument cherrypicks the data, distorts the facts, misuses several underlying trends and is logically flawed and false for many reasons.

96.    McBride's statement was false and misleading because ███████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

97.    The next Board meeting was on August 2, 2016, at which Defendants

McBride, Ananda, Jones, and Huebner were present.    During that meeting,

████████████████████████████████████████████████

███████████████.[23]

98.    In the accompanying Board presentation for the August 2, 2016

meeting,[24] ███████████████████████████████████

████████████████████████████████████████████████

---

[23] STMP-HR220 01329.

[24] Separate Board materials for the July 27, 2016 meeting were not produced among the §220 documents.



99.   The presentation ████████████████████████

100.   But tellingly, ████████████████████████

101.   ████████████████████████████████████████

---

[25] STMP-HR220 01231 at 01243.
[26] STMP-HR220 01231 at 01244-1246.
[27]   STMP-HR220 01231 at 01247.   In fact, no such disclosure was made by Defendants in the 2016 Form 10-K.



102.   Perhaps even more astonishingly, despite Defendant McBride's assertion during the July 27, 2016 earnings call that the Reseller Program was not cannibalizing USPS revenues and represented a small percentage of revenue to the Company, ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████ [28]

### 7.    The Company Pushes Forward and ████████████

103.   On October 25, 2016, the Board held a meeting at which Defendants Ananda, Habiger, Jones, McBride, and Huebner were present.  At the meeting, ██

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

---

[28] STMP-HR220 01130 at 01270-271.

104.   In other words, the Board was told ███████████████████

105.   Another slide on the Company's 2014 Strategy was ███████████

███████████████████████████████████████[29]

106.   At the same time, the Board was ████████████████████

---

[29] STMP-HR220 01130 at 01222.



107.

8.

108.   As noted above, the USPS had taken specific action to avoid this type of abuse of the Reseller Program.  Stamps.com's decision to offer discounted rates to current USPS customers was in direct violation of the Reseller NSAs.  The USPS designed the Reseller NSAs to prohibit Resellers from calling on current USPS customers—*i.e.*, to avoid cannibalization of USPS existing revenues.

109.   Despite the USPS raising concerns about the Company's abuse of the Reseller Program, the Company did not stop the misconduct.  In early 2017,

---

[30] *Id.*  at 01213.
[31] *Id.*

████████████████████████████████████████████████████████

████████████████████████████████████████████████████.

110.   According to a former employee of Stamps.com (the Former Employee"),[32] the USPS sales representatives provided the most lead generation for the Company.   The Former Employee stated that, in late 2016 or early 2017, the Company began a huge push to call on pre-existing USPS customers and move them into the Reseller Program.   The Former Employee also stated that, in the second quarter of 2017, Stamps.com became even more aggressive with the Reseller Program.   ████████████████████████████████████████

██████

111.   On February 14, 2017, the Board held a meeting at which Defendants Ananda, Habiger, Jones, McBride, Samuels, and Huebner were present.   During the meeting, ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████h

---

[32] Prior to filing this action, Plaintiff's counsel conducted an investigation into the underlying, facts pertaining to this action.   During that investigation, Plaintiff's local counsel had numerous conversations with the Former Employee, who worked at Stamps.com's corporate headquarters.

████████████████████████████████████████████████████

██████████████████████████████ █ ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████ █ ████████████████████████████████

████████████████████████████████████████████████████

████████████████████.

112.   Other slides in the presentation ███████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████ █ ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████[36]

113.   As set forth in further detail below, ████████████████████████

████████████████████████████████████████████████████

---

[33] STMP-HR220 00801 at 00802.

[34] STMP-HR220 00933 at 00977-979.

[35] *Id. a*t 01020.

[36] *Id.* at 00987. ██████████████████████████████

████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████

114.   During the Company's earnings call subsequent to the February 14,

2017 Board meeting, McBride continued to issue materially false and misleading

statements to investors.  On February 23, 2017, McBride stated the following:

> With that, let me just mention about the USPS. They are always and
> have been always our most important partner.  ***We have a common
> goal with the USPS which is growing package volume and serving
> and retaining USPS Customers.***  We've made significant investments
> in creating, developing and growing the online mailing and shipping
> category since 1999.
>
> We've invested more than $1.5 billion from 1999 through 2016 in
> customer service and support, research and development, sales and
> marketing, technology, infrastructure, product development and other
> areas. And all that's gone into support of helping the USPS grow their
> business and retain their customers. We've had over 15 billion in
> cumulative postage printed through our solutions since we launched in
> 1999.
>
> USPS recently reported that they processed and delivered a record
> volume of packages during the 2016 holiday season and for the entire
> quarter. USPS stated when they reported their fiscal 2016 result last
> fall, they continue to win e-commerce customers, grow their package
> delivery business and they delivered more e-commerce packages to
> the home than any other shipper because of their application service,
> their enhanced visibility and competitive pricing. ***And we continue to
> enjoy a great partnership with the USPS. We feel that we've created
> a sustainable win-win model [for] both of us that will result in the
> continued growth of USPS packages.***

115.   These statements were materially false and misleading because, ██

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████, and, for that reason, the Company did not create a sustainable "win-win model" or have with the USPS a "common goal."

116.   On April 25, 2017, following McBride's misstatements, the Board held a meeting at which Defendants Ananda, Jones, Habiger, Samuels, McBride, Huebner, Carberry, and Lipson were present.   During the meeting, ██████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

### 9.   The USPS Lashes Out at Stamps.com Again and Begins the Process of Reforming the Reseller Program

117.   While the Company continued to execute on its abusive practices, the USPS began to take further notice, and Company insiders were told that the Company's relationship with the USPS was falling apart.

118.   According to the Former Employee, no later than early 2017, "the USPS got pissed because they realized they were losing money on the Reseller Program with Stamps.com."   The Former Employee noted that calling on existing USPS accounts for the Reseller Program was against the USPS NSAs.

119.   The Former Employee also explained that the USPS conveyed its disapproval of Stamps.com's business practices at the National Postal Conference, held on May 21-24, 2017.   While the Former Employee did not know the exact nature of the discussion, the Former Employee stated that certain executives

attended the conference (including Chief Sales Officer Steve Rifai) and, upon their return from the conference, it became apparent that the USPS was angered by Stamps.com's abuse of the Reseller Program.  The Former Employee indicated that by the second quarter of 2017, it was apparent that the contract with the USPS was not going to be a long term one due to this abuse.

120.   Thereafter, the Former Employee explained that he or she was tasked with conducting analyses to determine how much revenue Stamps.com was going to lose as a result. The Former Employee also attended in-person monthly revenue meetings (at the end of each month) held at the Company's corporate headquarters, where managers met with Candi Booth and Steve Rifai. At those meetings, the Former Employee stated that the issues the USPS had with the Company's practices became a topic at most meetings after the second quarter of 2017.

121.   The Former Employee's recollection of the events is corroborated by statements made by McBride during the Company's earnings call held on May 3, 2017.  The following questions and answers imply that McBride knew that changes to the Reseller Program were on the horizon, although McBride falsely asserted that nothing "material" was expected:

**Kevin Liu**

Understood and is there anything that's changing in terms of kind of the economics of the relationships you have whether it's with the USPS or other partners that would prompt some conservatives on

guidance or is it really just kind of the form you're going about guidance the same way you always have.

**Kenneth McBride**

*Yeah, there's nothing that points you specifically* and of course we wouldn't be disclosing specifics of the partnerships, but it's just the same approach we've taken in years past and *we don't really expect any material changes to any kind of the underlying economics or the revenue share agreements that we have.*

122.   The Former Employee's statements are also corroborated by a blog post written in September 2017 relating to the National Postal Conference. In that post, Gordon Glazer, an industry expert, stated:

*In April of this year [2017], rumors were flying around amongst postal industry insiders regarding major changes to the Reseller program;* that a letter was "on the way" to the 3 licensed Reseller holders that would further define the use and administration of the programs. *While no letters ostensibly arrived, rumors further circulated that all would be revealed by the National Postal Forum in May 2017. While there were reported closed-door meetings with senior USPS officials and the Resellers, no written guidance was released or revealed publicly.*

123.   In August 2017, Stamps.com received a letter from its Reseller partner, Parcel Partners, which disclosed the USPS's position and new restrictions designed to reign in abuse of the Reseller Program.   The letter noted that *both* Stamps.com and Parcel Partners knew *no later than by April 2015* that the changes would come. Parcel Partners' letter stated as follows:

*The time has come, we knew the USPS Reseller Model would be changing, that is why we provided you with as much insight as we had into the changes last April. The Post Office has decided to initiate the changes now (see attachment). The letter has some*

*significant changes but nothing that has not already been discussed.
We knew they were concerned with short pay and Resellers not
having direct relationships with shippers. They have structured the
program in a way to accomplish both.*

The direct relationship will allow us to assist more actively on abusers
of short pays. The USPS has always seen the Shipper to be the
customer of whoever's contract they are shipping on ….

These changes have brought us at a crossroads. We can partner
together or you can find another option …

Alternatively, if our partnership were to part ways the exposure is
decreased referral fees and competition from competitors with more
capital. *The recent USPS changes have changed the landscape.*
These changes position the PC Postage providers in different position.
We can continue to partner together to protect the customers base and
continue to grow or you can venture on your own. Should you choose
to continue our partnership, we will need your assistance to help us
collect the additional data required of shippers "Third Party" data.

124.   Gordon Glazer noted in his September 2017 blog post that the

changes to the Reseller Program would "require a herculean effort to collect the

required client information and prior usage history for each user."

125.   McBride was fully aware of the investigations into the Reseller

Program and the turmoil that would result once the USPS unearthed the magnitude

of Stamps.com's abuse of the Reseller Program.  But he proceeded to make other

false and misleading statements about Stamps.com's relationship with the USPS

during the call:

**Darren Aftahi**

Got it and then just one more, we've heard some chatter that the USPS
is kind of let around the participants in the reseller program with some

potential changes. I'm just wondering if you have any commentary around that and whether Stamps kind of received that letter. Thanks

**Kenneth McBride**

There was no letter. The rumor is false. I mean think I tried to point out some of the broad global understanding of what the USPS and the partnerships they've done and the revenue share they've offered out to us in the reseller and the e-commerce industry in general. I think that one of the key things to focus on is, are they being successful or no and therefore are they going to make changes or not. And when you look at the big numbers, I mentioned they're growing at 16 % last year. They're outgrowing the industry by 2X and so USPS is having a ton of success in e-commerce particularly and so in their shoes you got to ask yourself would you make a major change when you're growing twice the industry rate. *The[y] are very happy with how things have gone.* The revenue shares they've offered to the industry to e-commerce have generated a lot of activity focused on them. They're winning the e-commerce marketplace and they're being very successful doing it. *USPS is very happy with the approach they've taken in business model and they're very happy with the relationship with Stamps.com. We talk to them constantly, to the more senior folks there, so we're happy and they're happy.* The letter information has been propagated we believe is part of the strategy with our stock, so it's not true.

### 10.     **Despite These Further Warnings,** ▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮

126.   On July 25, 2017, the Board held a meeting at which Defendants Ananda, Habiger, Jones, Samuels, McBride, Huebner, and Lipson were present. McBride presented an overview of the Stamps.com's business, including second quarter financial results and business operation results.

127.   As to Endicia, the Board was told that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



_____

[37] *Id.* at 00628.
[38] STMP-HR220 00559 at 00629.



128.   On August 2, 2017, only eight days after the June 25, 2017 Board meeting, McBride stated the following false and misleading statement during the Company's 2Q17 earnings call:

> The reseller business is growing to the tune that the USPS reseller program is and is providing solutions down-market where the USPS doesn't have the sales team to interact. ***The USPS doesn't see any reason why the program wouldn't continue to serve both customers and the needs of the Postal Service going forward. Finally, the USPS looked at resellers and PC postage providers like Stamps.com and Endicia as excellent partners on bringing the best solutions to customers.***
>
> ***We continue to enjoy a great partnership with the Postal Service and feel that we've created a sustainable win-win model for both of us, which will result in a continued growth of USPS packages and e-commerce and online postage more generally.***

129.   On October 24, 2017, the Board held another meeting at which Defendants Ananda, Habiger, Jones, Samuels, McBride Huebner, Carberry and Lipson were present. [39]

130.   On February 16, 2018, the Board held a meeting at which Defendants Ananda, Habiger, Jones, McBride, Samuels, and Huebner were present.   At the meeting, the Board reviewed and endorsed the business plan for 2018.

131.   During the meeting, [40]

132.   Less than a week later, on February 21, 2018, Stamps.com announced its results for the fourth quarter and fiscal year ended December 31, 2017.   The earnings press release included a quote from McBride saying: "We achieved strong financial results driven by exceptional performance in our shipping business.   We

---

[39] STMP-HR220 00664 at 00732.
[40] STMP-HR220 00005 at 00024.

believe we are well positioned for 2018 and ***we remain excited about our long-term business opportunities***."[41]

133.   Again, McBride's statement was false and misleading.  In touting the Company's success, McBride failed to acknowledge or otherwise recognize that the Company was able to achieve such "strong financial results" by taking advantage of the Reseller Program, and that the Company's unsustainable business model posed a threat to any long-term business opportunities.

134.   On April 25, 2018, the Board held a meeting at which Defendants Ananda, Habiger, Jones, McBride, Samuels, Huebner, Carberry, and Lipson were present.   During the meeting, McBride gave a presentation concerning the Company's financial performance and business strategies.

135.   Notably,   the   Board



:

---

[41] Press Release, Stamps.com, Stamps.com Reports Fourth Quarter And Fiscal 2017 Results (Feb. 21, 2018).



136.   Notwithstanding, the Insider Seller Defendants continued to unload millions of dollars' worth of Stamps.com stock into the market at inflated values.

137.   On July 25, 2018, the Board held a meeting at which Defendants Ananda, Habiger, Jones, Samuels, Huebner, Carberry, and Lipson were present. During the meeting, 

---

[42] STMP-HR220 00440 at 00452.

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████  ███████████████████

██████████████████████████████████████████

███████████████████████.

138.   In April 12, 2018, President Trump signed an executive order establishing a governmental Task Force evaluate USPS' operations and finances. The Executive Order noted in part that the "USPS is on an unsustainable financial path and must be restructured to prevent a taxpayer-funded bailout" and "has incurred $65 billion of cumulative losses since the 2007-2009 recession." Subsequently on July 23, 2018 the USPS Office of the Inspector General issues a report entitled "Postal partnerships: The Complex Role of Middlemen and Discounts in the USPS Package Business."  With the exception of the first page, that entire report has not been made public due to UISPS claims of "the commercial sensitivity of product pricing strategy" of the information in the report.

139.   On August 1, 2018, the Company issued its second quarter 2018 results.  During the associated earnings call, despite these governmental reviews, McBride continued to falsely portray to the investing public that the USPS viewed

---

[43] STMP-HR220 00303 at 00319.

the Reseller Program positively and that the Company's long-term partnership with

the USPS was secure, stating:

> **Kevin Liu**
>
> Got it. That's helpful. Switching gears a little bit with the Trump Task
> Force on the USPS ... ***Was wondering if you guys participated in any
> sort of conversations with the Task Force and if so is there anything
> you wouldn't heard from either those conversations or maybe the
> USPS OIGs report last month on kind of the postal partner
> ecosystem that would suggest any significant changes are coming***?
>
> **Ken McBride**
>
> Yes, so the Task Force was formed and it's doing lots of interviews
> with all the various constituents out there. We have spoken to the
> members of the Task Force several times the final report is expected
> to be issued August 10. We don't know th[e] specific[s] in their
> report, ***but you know when you think that based on our
> conversations the report will you know come out strongly in favor of
> partnerships between the USPS and private industry like the
> partnerships we've had with the USPS. So we'll be interested to see
> what comes out on the report on August 10.***

140.   On August 8, 2018, the Company issued a Form 10-Q that, for the

first time, included a disclosure that the USPS was seeking to renegotiate its

arrangements with Stamps.com.  The disclosure was false and misleading.  Buried

in a list of ten risk disclosures, the Board and officers disclosed the following:

> The USPS could modify, discontinue or terminate agreements and
> other financial compensation arrangements, which would have an
> adverse effect on our revenues and operating results.
>
> The USPS could decide to amend, renegotiate, discontinue or
> terminate one or more of our financial compensation arrangements
> that exist now or in the future. If the USPS decides to amend,
> renegotiate, discontinue or terminate any of our agreements or our

integration partners' agreements under which we are compensated directly or indirectly by the USPS or integration partners for shipping customers who print a certain amount of postage, or our credit card cost sharing agreements which govern the allocation of credit card fees paid by the USPS and us, then our revenue and operating results would suffer. ***In the history of our relationship with the USPS, we have had many of these important agreements renewed only on short-term extensions and without assurances of any long-term commitments by the USPS.*** During the previous calendar quarter, the USPS provided ***a notice requiring the renegotiation of one of our important financial compensation arrangements. While we believe that this agreement is mutually beneficial to the USPS and to us***, there is a risk that renegotiation is unsuccessful and leads to materially less favorable terms ***or that the USPS decides to not renew one or more of these financial compensation arrangements***. In such case, our revenue and operating results will be materially affected unless we are successful in timely replacing the lost revenue with similar compensation from other potential partners.

141.   These disclosures were false. ███████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

142.   On October 24, 2018, the Board held a meeting at which Defendants

Ananda, Habiger, Jones, McBride, Samuels, Huebner, Carberry and Lipson were

present. ███████████████████████████████████████

████ [44]

143.   Markedly, at the October 24 Board meeting, the Board also discussed and approved a new share repurchase plan effective for the period beginning November 12, 2018 and ending May 10, 2019.[45]   Following approval, the Company made more than $100 million of dollars' worth of stock repurchases from November 2018 to March 2019.

144.   The Board's cursory analysis for approving additional share repurchases was done in bad faith, was not a valid exercise of business judgment, and represents corporate waste.

145.   ███████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████ ██

███████████████████████████████████████

---

[44] STMP-HR220 00110 at 00118.
[45] STMP-HR220 00196 at 00199-00201.
[46] STMP-HR220 00303 at 00319.



146.   On  December  21,  2018,  the  Board  held  a  meeting  at  which Defendants  Ananda,  Habiger,  Jones,  Samuels,  McBride,  Carberry,  and  Lipson were present.  The minutes state that, during the meeting,

147.   Stamps.com  in  its  Section  220  production  did  not  produce  any communications with the USPS or internal communications concerning the status of those negotiations or any materials presented at the meeting.  Nevertheless, it is clear  from  the  above  that

.

148.   On  February  15,  2019,  the  Board  held  another  meeting  at  which Defendants  Ananda,  Jones,  Samuels,  McBride,  Carberry,  Clem,  and  Lipson  were

---

[47] STMP-HR220 00303 at 00437-00438.

present. The Board approved a new share repurchase plan after reviewing the following slide:



149. The February 15, 2019 presentation separately stated that 

███████████    ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

150.   After the market closed on February 21, 2019, Stamps.com held an earnings call to discuss its financial results from the 4th quarter of 2018 and fiscal year 2018, as well as "certain strategic items . . . that impact [its] business outlook for 2019."  During the call, McBride positioned the Company's failure to maintain its relationship with the USPS as the Company's decision, stating:

> As everyone knows, we've been in discussions with the USPS about a renewal of our long-standing revenue share agreement that we utilized to drive their shipping business. We have proposed our terms of renewal to the USPS.  One of our nonnegotiable items is that within our significant single carrier efforts offered under the brand name Stamps.com and Endicia, offered by our large national sale team, we will no longer be exclusive to the USPS.  And that's non-negotiable.

> USPS has not agreed to accept these terms or any other terms of our partnership proposal.  So, at this point we decided to discontinue our shipping partnership with the USPS so that we can fully embrace partnerships with other carriers who we think will be well positioned to win in a shipping business in the next five years.

> And we now plan to turn our significant assets such as our technology and product development, our salesforce, our significant marketing budget and our marketing organization towards the focus on partnerships with the carriers that will help our customers succeed over the next five years.  We're going to align ourselves with the

---

[48] STMP-HR220 00303 at 00320.

carriers that we think are going to be the winners in the shipping business.

We will continue to bring USPS products to our customers where it makes sense but in many segments of the business we will start bringing in the more competitive products from other carriers. We are currently in discussions or already have partnerships with all of the major incumbent private carriers and we're also in discussion with many of the new entrants into the U.S. shipping business.

Note that our decision to discontinue our exclusive partnership with the USPS does not in any way impact our regulatory relationship with them or the products and services we are able to offer our customers. The USPS regulatory group is governed in a separate part of the organization. We will continue to work constructively with them and we will comply with all their requirements as we always have.

151.   By driving away the USPS, Stamps.com gave up, according to its own Form 10-K filed with the SEC on March 1, 2019 (the "2018 10-K"), the primary driver of its revenue: "services and transactions related revenues from our USPS mailing and shipping services," which accounted at times for approximately *87 percent* of the Company's revenue.

152.   The Company's announcement stunned the market as Stamps.com had its worst single-day performance in its history, with shares plummeting by $114.43 from $198.08 on February 21, 2019 to $83.65 on February 22, 2018, *a decline of 58%*.

153.   Moreover, McBride's commentary on the reasons for the cancellation of the USPS Commission Agreements was false. Apparently, the Defendants' desire to hide their fraudulent practices was so great that they preferred that the

public believe they voluntarily decided to eliminate 58% of the Company's market capitalization.

154.   On May 8, 2019 Stamps.com held another earnings call.  On that call, McBride disclosed for the first time that the Company was aware that the USPS was in negotiations with the Resellers and that such negotiations would likely lead to lower economics for all parties involved with the Reseller Program.   When asked pointedly by an analyst when McBride knew of the USPS negotiations with the Resellers or potential changes to the Reseller Program, McBride responded as follows:

**Q - Zach Cummins**

Hi, good afternoon. I guess, just starting off, when did you *really* become aware of the potential changes to the reseller arrangements?

**Ken McBride**

***It was just very recently.***

155.   The analyst question alone presupposes that McBride was not at all forthcoming.   ████████████████████████████████████████████████

████████████████████████████████████████████.

156.   Following the May 2019 earnings call, the Company's stock plummeted once again, ***falling 55.8%*** from $83.39 to $36.90.

**D.     Defendants McBride, Huebner, Carberry, Ananda, Habiger, Jones and Samuels Made, Disseminated, or Approved False or Misleading Statements about the Company**

157.   During the Relevant Period, Defendants McBride, Huebner, Carberry, Ananda, Habiger, Jones and Samuels (the "Section 10(b) Defendants") made, disseminated, or approved false or misleading statements about the Company specified herein, which they knew or deliberately disregarded were false or misleading and were intended to deceive, manipulate, or defraud.

158.   Specifically, from 2016 to 2019, the Section 10(b) Defendants touted the Company's strong financial performance, including revenue and earnings growth, while concealing that these financial metrics were the product of an unsustainable and improper reseller scheme to inflate Stamps.com's financial results at the expense and to the detriment of the USPS.

159.   For instance, Stamps.com's 2015 Form 10-K, filed on February 29, 2016, and signed by Defendants McBride, Jones, Ananda and Huebner stated as follows:

> For service revenue, we earn revenue in several different ways: (1) customers may pay us a monthly fee based on a subscription plan; (2) customers may qualify under our USPS partnership to have their service fees waived or refunded and then we are compensated directly by the USPS; (3) customers may pay us a fee per shipping label printed; *(4) we may earn compensation by offering customers a discounted postage rate that is provided to the customers by our*

***partners; and (5) we may earn other types of revenue shares or other compensation from specific customers or partners.***[49]

160.   The above disclosure was false and misleading when made because the 2015 Form 10-K did not disclose or provide any information on the economics as to Stamps.com's side agreements with Resellers or the amount of revenues Stamps.com generated from these arrangements.

161.   The 2015 Form 10-K also include the following among its disclosed risk factors:[50]

**The USPS could modify or terminate agreements and other financial compensation arrangements.**

The USPS could decide to amend, renegotiate or terminate agreements or financial compensation arrangements that exist now or in the future. For instance, if the USPS decides to amend, renegotiate or terminate our credit card cost sharing agreements, which govern the allocation of credit card fees paid by the USPS and us, our revenues and operating results could suffer. ***In addition, if the USPS decides to amend or renegotiate our arrangements under which we are compensated directly by the USPS for shipping customers or integration partners who print a certain amount of postage, our revenue and operating results may be negatively impacted.*** If the USPS decides to terminate our agreements under which we are compensated directly by the USPS for shipping customers or integration partners who print a certain amount of postage, our revenue and operating results would suffer.

**The USPS could modify or terminate discounts our customers receive.**

---

[49] 2015 10-K at 33 (emphasis added).
[50] 2015 10-K at 21.

The USPS could decide to amend or terminate the discounts our customers and integration partners receive. Customers using our services receive discounted postage rates, either from Stamps.com or from integration partners that provide discounted rates, compared to USPS retail rates on certain mail pieces such as First Class letters and packages, domestic and international Priority Mail and Priority Mail Express packages, and other discounts available to high-volume shipping customers. ***If the USPS decides to withdraw certain discounts or even remove the discounts entirely, our revenue and operating results will suffer. If the Postal Regulatory Commission decides the discounts are unlawful and require the USPS to cancel or change them, then our revenue and operating results would suffer.***

162.   The above risk disclosure was materially false and misleading when made because it failed to disclose that the Officer and Director Defendants were causing the Company to engage in a wrongful course of business whereby Stamps.com, in contravention of USPS governance and its contractual relationship with the USPS, was cannibalizing existing USPS customers and skimming profits from the USPS, which practices were adversely impacting the USPS and placing Stamps.com's USPS Commission Agreement and back-end agreements with Resellers in jeopardy.  The 2016 Form 10-K was also false and misleading for each of the following reasons:

      a.    that Stamps.com's Board ███████████████████

████████████████████████████████████████████████

███████████;

b.      that, beginning no later than February 2016, the USPS had put Resellers on notice that cannibalization of USPS customers an improper use of the Reseller Program;

c.      that contrary to its contractual relationship with the USPS and USPS policy, Stamps.com was using its ShipStation, ShipWorks and Endicia platforms, plus its arrangements with other Resellers, to aggregate low volume customers in order to improperly obtain discounted USPS rates available only to high volume shippers, and then to appropriate a substantial portion of that discount for its own benefit;

d.      ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████;

e.      that Stamps.com's strong financial results were dependent on the manipulation of a USPS Reseller Program that improperly benefited Stamps.com at the expense of the USPS, which was losing an estimated $235 million per year as a result of Stamps.com's misuse of the Reseller Program;

f.      that Stamps.com concealed the truth about its reseller scheme and instead repeatedly publicly represented that its purportedly strong financial performance was the result of the Company's strong relationship with the USPS; and

g.   that Stamps.com's reseller scheme represented a significant financial risk to Stamps.com's lucrative exclusive partnership with the USPS and its back-end agreements with Resellers.

163.   On May 9, 2016, Stamps.com issued a press release announcing its financial results for the first quarter of 2016.  The press release stated in part:

> "We were pleased with the first quarter performance across all areas of our business," said Ken McBride, Stamps.com's chairman and CEO. *"We made significant progress in the integration of Endicia and we began to realize synergies with that business. In addition, we experienced continued strong performance within our traditional SOHO, enterprise and high-volume shipping businesses, as well as with our prior acquisitions of ShipStation and ShipWorks.* As a result of the across-the-board strength we generated record top and bottom-line performance, and we achieved record outcomes in several metrics such as paid customers, average revenue per paid customer, and total postage printed. With the expected continued strength in all areas of our businesses, we increased our 2016 guidance today."

164.   The May 9, 2016 press release also reported the Company's first quarter 2016 financial results:

> *Mailing and Shipping revenue (which includes service, product and insurance revenue from all customers but excludes Customized Postage revenue) was $79.2 million, up 84% versus the first quarter of 2015.* Customized Postage revenue was $2.6 million, up 167% versus the first quarter of 2015. On a GAAP basis, which includes stock-based compensation expense, Mailing and Shipping gross margin was 84.3%, Customized Postage gross margin was 17.8% and total gross margin was 82.1%.

> *On a Non-GAAP basis, Mailing and Shipping gross margin was 84.8%, Customized Postage gross margin was 17.9% and total gross margin was 82.7%.* On a GAAP basis, the Company recorded net income for the first quarter of $13.2 million. On a per share basis,

total first quarter 2016 GAAP net income was $0.71 based on 18.7 million fully-diluted shares outstanding. First quarter 2016 GAAP net income was reduced by $7.5 million of non-cash stock-based compensation expense, $3.3 million of non-cash intangible amortization expense, $0.6 million of non-recurring acquisition related expenses, $93 thousand of non-cash amortization of capitalized debt issuance costs and $7.3 million of non-cash income tax expense.

165.   During the Company's earnings call that day, McBride stated:

Total USPS postage printed through our solutions was $1.2 billion in the first quarter, which was up 122% versus the first quarter of 2015. *Last year, Stamps.com, along with all of its subsidiaries, represented an estimated one-third of all USPS domestic priority mail, which is the primary package service of the U.S. Postal Service.* Additionally, during 2015, the combined companies processed over 1 billion packages.

Average monthly revenue per paid customer, or ARPU, was $40.65 in the first quarter and that was up 58% versus the first quarter of 2015. The growth in ARPU benefited from continued growth in the shipping business, *including positive contributions from the traditional high volume shipping area as well as from all of our acquisitions, Endicia, ShipStation and ShipWorks. Specifically, the growth in ARPU has been driven by the higher ARPU typically associated with higher volume shippers.* All three of our acquisitions ShipStation, ShipWorks and Endicia have higher ARPU than our historical average. *And also, ARPU is now directly correlated with the postage growth owing to the various ways we are now able to monetize the postage volume.*

\*       \*       \*

And then finally, we plan to continue enhance the enterprise sales and marketing efforts. *The solution continues to present a strong customer value proposition compared to postage meters,* including the lower total cost of ownership greater visibility into individual employee activity and our web-based financial and administrative controls. We plan to continue increasing, optimizing and refining our enterprise customer lead generation and our sales to marketing efforts

and continue to working on improving the efficiency of our sales team in that area.

166.   The statements in ¶¶ 163-165 above were each false and misleading when made.  The true facts, which were then known to, or recklessly disregarded by the Section 10(b) Defendants, were:

a.     that Stamps.com was not generating "continued strong performance" in its "high-volume shipping businesses." Rather, Stamps.com was engaged in an unsustainable reseller scheme to bundle small-volume shippers and skim profits from the USPS;

b.     that Stamps.com's strong gross margins, "growth in ARPU" "monetization of postage volume" and "strong customer value proposition" were substantially due that scheme:

c.     that Stamps.com was engaged in a wrongful course of business whereby Stamps.com, in contravention of USPS governance and its contractual relationship with the USPS, was cannibalizing existing USPS customers and skimming profits from the USPS, which practices were adversely impacting the USPS and placing Stamps.com's USPS Commission Agreement and back-end agreements with Resellers in jeopardy; and

d.     each of the facts set forth at ¶ 162(a)-(g) above.

167.   On July 28, 2016, Stamps.com issued a press release announcing its financial results for the second quarter of 2016.  The press release stated in part:

"The acquisition of ShippingEasy will further accelerate Stamps.com's ongoing investments in shipping technology for e-commerce driven package shipping, the fastest growing segment within the mailing and shipping space," said Ken McBride, Stamps.com's chairman and CEO. ***"Our investments across all our companies in the areas of sales and marketing, customer service, product development and technology innovation have led to growth in packages shipped by our customers, which in turn have contributed to our great financial performance.*** Based on our outstanding results and the continued strength in our businesses, we increased our 2016 guidance today."

168.    The July 28, 2016 press release also reported the Company's second

quarter 2016 financial results:

Total revenue was $84.0 million, up 74% compared to the second quarter of 2015. ***Mailing and Shipping revenue (which includes service, product and insurance revenue but excludes Customized Postage revenue) was $81.5 million, up 72% versus the second quarter of 2015.*** Customized Postage revenue was $2.5 million, up 130% versus the second quarter of 2015. GAAP gross profit, which includes $0.45 million of stock-based compensation expense, was $70.3 million and GAAP gross margin was 83.7%. Excluding stock-based compensation expense, Non-GAAP gross profit was $70.7 million and Non-GAAP gross margin was 84.2%.

Second quarter 2016 GAAP income from operations was $25.0 million and GAAP net income was $14.3 million. GAAP net income per share was $0.79 based on 18.2 million fully diluted shares outstanding. This compares to second quarter 2015 GAAP loss from operations of $15.2 million and GAAP net loss of $10.4 million or $0.64 per share based on basic shares outstanding of 16.4 million. Basic shares outstanding were used for the 2015 period because the effect of common equivalent shares would have been antidilutive given the net loss.

169.    During the Company's earnings call that day, Huebner stated:

***ShippingEasy augments our portfolio of shipping solutions to better meet the needs of our customers and help grow USPS package***

*volumes. In addition to a very impressive web based technology platform, ShippingEasy focuses on providing simple and efficient value added features for shippers.*

*ShippingEasy targets customers that can benefit from sophisticated features in an easy to utilize interface to help them grow their business, which in turn helps grow package volume.* ShippingEasy has an inside sales force, which has proven very effective in acquiring customers. The purchase price was $55 million in cash, which was funded from current cash balances and will be reflected in our Q3 results.

170.   During the same call, McBride engaged in an attempted defense of Stamps.com's Reseller practices, during which he claimed that "various sources" had issued material that was "inaccurate or misleading."  Among other things:

a.   McBride represented that the USPS designed the Reseller Program to provide substantial discounts to USPS customers and was benefitted as a result.  For example, he sated, that **"[t]he USPS made reseller rates available as a deliberate strategy to drive package growth and accomplish its business goals of competing more effectively with the private carriers."**

b.   McBride represented that the USPS condoned the use of the Reseller Program to provide substantial discounts to smaller customers and customers which previously paid a more substantial rate.  For example, McBride stated:

- *"[F]or these lower volume shipping customers, the USPS purposefully decided to address and serve that [segment] through its reseller partnerships. The resellers are explicitly authorized by the USPS to offer discounted rates to smaller shippers at rates below commercial*

***base pricing;***

- "An important goal of the reseller program is in fact acquiring new customers, but another important goal is the retention of existing customers…."

- Furthermore, NSAs and reseller agreements are negotiated, endorsed and promoted by the U.S. Postal Service under strict regulatory oversight and each one is approved by both the Postal Regulatory Commission and the USPS Board of Governors. ***We worked very closely with senior members of the USPS management team on a weekly basis. In our view, the NSAs and the reseller programs are well known throughout the USPS organization, are encouraged by USPS management and are viewed as having been successful in driving growth for the USPS.***

- ***In summary, the reseller program was meant to provide attractive rates to lower volume shippers,*** which are too numerous for the USPS to support with their own individual discounts. The reseller program is meant both for the acquisition of new volume and for the retention of existing volume, both of which must happen in order for the USPS to generate growth.

- Reseller rates are instrumental in making the USPS more competitive versus private carriers and in driving significant innovation in over 100 e-commerce software tools, which use them to feature attractive USPS rates and which in turn drive USPS growth. ***Discontinuing customer discounts such as those offered to resellers would alienate this entire e-commerce ecosystem that includes marketplaces such as eBay and more than a 100 e-commerce solutions.***

- Finally, the USPS has made a clear statement on its view point of the reseller program through the continued extensions it has provided to the reseller companies for the past seven years. We expect them to continue to do so and to extend the reseller program into the future.

- Yeah, I mean like I said, we're in constant contact with the USPS all the way up to the senior management level. We work directly with their sales team, our sales force and their sales force work together constantly, so you know the USPS organization from bottom to the top is very aware of the reseller program and they are very supportive of the business practices of both Stamps.com and the resellers.

c.     McBride further represented during the July 28, 2016 earnings call that the Reseller Program had only a minor impact on Stamps.com's revenue. For example, McBride stated:

- "Stamps.com has an important partnership with IntuiShip, but *Stamps.com and IntuiShip are not a single company, and IntuiShip represents less than 10% of our revenue.* The USPS regulates us and they regulate the resellers very closely and they understand and support the business practices of both of us.

  o  At the same time, when an analyst asked, "what percentage of your revenues today come from resellers in the form of, kind of the referral fees or revenue share arrangements that you have in place?" McBride responded, "we wanted to provide some inside into some of the metrics in the business and in order to help explain the reseller program*, we don't like to disclose specific partner information beyond that, and there is very confidential competitive information* so we – IntuiShip is less than 10% and that's the main bullet point we like put out there."

- "We like to additionally note here that while retaining USPS shipping volume is an important goal, it is also not a common practice of ours as *only approximately 3% of our customers have been offered discounts with the reseller rates in order to retain their volume with the USPS."*

- *The report also asserts that revenue from our reseller partners is at a 100% EBITDA margin, but this is not the case.* We invest significant amounts of money in sales and marketing to acquire and retain customers. We also invest significant amounts of money in customer service and support, product development, technology, and technology infrastructure."

171.   The statements in ¶¶ 167-170 above were each false and misleading when made.  The true facts, which were then known to, or recklessly disregarded by the Section 10(b) Defendants, were:

a.    that Stamps.com was not generating "continued strong performance" in its "high-volume shipping businesses." Rather, Stamps.com was engaged in an unsustainable reseller scheme to bundle small-volume shippers and skim profits from the USPS;

b.    that the USPS did not "purposely decid[e] to address and serve [the lower volume shipping customer] segment through its reseller partnership" by "offering discounted rates to smaller shippers at rates below commercial base pricing," or to "provide attractive rates to lower-volume shippers," nor was the USPS "very supportive of the business practices of both Stamps.com and the resellers."  In fact, the USPS had decided exactly the opposite, and it did not condone the cannibalization of its revenues from low volume shippers through the use of Resellers;

c.    that, although Stamps.com and IntuiShip were "not a single company," Stamps.com and IntuiShip coordinated their sales efforts to gain revenues that otherwise would have gone to the USPS from low volume customers.

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████;

d.    that whether or not (i) IntuiShip represented "less than 10%" of Stamps.com's revenue," or (ii) Stamps.com's EBITDA from Resellers was less

than 100%, ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████ ;

      e.    that while McBride claimed that "only 3% of our customers have been offered discounts with the reseller rates in order to retain their volume with USPS," ████████████████████████████████████████████

███████████████████████████████████████████████████ ;

      f.    that Stamps.com was engaged in a wrongful course of business whereby Stamps.com, in contravention of USPS governance and its contractual relationship with the USPS, was cannibalizing existing USPS customers and skimming profits from the USPS, which practices were adversely impacting the USPS and placing Stamps.com's USPS Commission Agreement and back-end agreements with Resellers in jeopardy;

      g.    ███████████████████████████████████████████

███████████████████████████████████████████████████

█████████████ ;

h.      that, beginning no later than February 2016, the USPS had put Resellers on notice that cannibalization of USPS customers an improper use of the Reseller Program;

i.      that contrary to its contractual relationship with the USPS and USPS policy, Stamps.com was using its ShipStation, ShipWorks, Endicia and ShippingEasy platforms, plus its arrangements with other Resellers, to aggregate low volume customers in order to improperly obtain discounted USPS rates available only to high volume shippers, and then to appropriate a substantial portion of that discount for its own benefit;

j.      ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████ ;

k.      that Stamps.com's strong financial results were dependent on the manipulation of a USPS Reseller Program that improperly benefited Stamps.com at the expense of the USPS, which was losing an estimated $235 million per year as a result of Stamps.com's misuse of the Reseller Program;

l.      that Stamps.com concealed the truth about its reseller scheme and instead repeatedly publicly represented that its purportedly strong financial performance was the result of the Company's strong relationship with the USPS; and

m.    that Stamps.com's reseller scheme represented a significant financial risk to Stamps.com's lucrative exclusive partnership with the USPS and its back-end agreements with Resellers.

172.   On November 3, 2016, Stamps.com issued a press release announcing its financial results for the third quarter of 2016.  The press release stated in part:

> "We were very pleased with our third quarter performance," said Ken McBride, Stamps.com's chairman and CEO. "We completed our acquisition of ShippingEasy and have begun the process of leveraging our collective Company's resources and expertise in sales and marketing, customer service, product development and technology innovation. ***In addition, we experienced continued strong performance with our traditional small business, enterprise and high-volume shipping customers, as well as with our prior acquisitions of Endicia, ShipStation and ShipWorks.*** As a result of the across-the-board strength, we also achieved strong performance in several business metrics such as paid customers and average revenue per paid customer. With expected continued strength in our business, we increased our 2016 guidance today."

173.   The November 3, 2016 press release also reported the Company's third quarter 2016 financial results:

> Third quarter 2016 total revenue was $92.6 million, up 79% compared to the third quarter of 2015. ***Third quarter 2016 Mailing and Shipping revenue (which includes service, product and insurance revenue but excludes Customized Postage and Other revenue) was $87.6 million, up 78% versus the third quarter of 2015.*** Third quarter 2016 Customized Postage revenue was $4.9 million, up 98% versus the third quarter of 2015.

> Third quarter 2016 GAAP income from operations was $31.6 million and GAAP net income was $18.7 million. GAAP net income per share was $1.03 based on 18.1 million fully diluted shares outstanding. This compares to third quarter 2015 GAAP income from

operations of $13.0 million and GAAP net income of $7.3 million or $0.42 per share based on fully diluted shares outstanding of 17.5 million. Therefore, third quarter GAAP income from operations, GAAP net income and GAAP income per fully diluted share increased by 143%, 157% and 148% year-over-year, respectively.

174.   During the Company's earnings call that day, McBride stated:

**Growth in ARPU benefitted from the continued growth in our shipping business because those customers pay higher subscription fees and we collect additional partnership revenue share in that area.** Total postage printed through all our solutions was 1.4 billion in the third quarter and that was up 8% versus the third quarter of 2016. We would note that the total postage growth includes slower growth traditional mail postage, as well as the higher growth shipping postage. Our management team and all of our employees are very proud of the continued financial and business success we've generated for our shareholders.

With that, let me provide an update based on a subset on some of the initiatives we're working in 2017 we're continuing to work on. **First, we're continuing to leverage the product portfolio of mailing and shipping solutions to drive continued strong growth. The acquisitions we've made coupled with our traditional solutions, we now have a full suite of diverse solutions across our five brands, ShipStation, ShipWorks, ShippingEasy, Endicia and Stamps.com.** Our product solutions meet the need of a broad array of target customers that include ecommerce merchants, warehouse fulfillment houses, larger retailers and other types of shippers.

\*     \*     \*

**Finally, we're going to continue capitalizing on the synergy opportunities with our acquired companies.** Across all the products and services, we're realizing in synergies in sales and marketing, operations, customer service, and in product development from all of the acquisitions we've done over the past three years. In the marketing area, Stamps.com and our acquired companies have historically targeted many of the same customers. We plan to continue utilizing our marketing expertise to accelerate the growth in all of our brands. We have also leveraged technology expertise across the companies

including web-based and client-based expertise, various operating system expertise, various methodologies and paradigms for product development and other thing.

\* \* \*

Thanks, Jeff. We've achieved the significant transformation of our business over the past few years with our acquisition and focus on shipping. The significant majority of our investment in the business and focus has been on shipping and we expect that to continue over the next five years.

***We're well positioned to capitalize on the shipping opportunities in our business;*** we expect the long-term growth rates to naturally benefit from the growth in ecommerce sales which have been growing at 15% year-over-year in 2016 and 2017.

175.   The statements in ¶¶ 172-174 above were each false and misleading when made.  The true facts, which were then known to, or recklessly disregarded by the Section 10(b) Defendants, were:

a.   that Stamps.com was not generating "continued strong performance" with its "shipping customers," nor was it "well positioned to capitalize on the shipping opportunities in our business."  Rather, Stamps.com was engaged in an unsustainable reseller scheme to bundle small-volume shippers and skim profits from the USPS;

b.   that Stamps.com's growth, and obtaining of "higher subscription fees and … additional partnership revenue share" in its shipping business, plus its "capitalizing on the synergy opportunities with our acquired companies," was substantially due to its deployment of an improper reseller

scheme, which violated both the terms and the spirit of the parties' contractual agreements with the USPS and allowed Stamps.com to cannibalize existing USPS customers and skim profits from the USPS, which practices were adversely impacting the USPS and placing Stamps.com's USPS Commission Agreement and back-end agreements with Resellers in jeopardy; and

        c.    each of the facts set forth at ¶ 171(g)-(m) above.

176.   On February 23, 2017, Stamps.com issued a press release announcing its financial results for year-end and the fourth quarter of 2016.  The press release stated in part:

> "We were very pleased with our fourth quarter and fiscal 2016 performance," said Ken McBride, Stamps.com's chairman and CEO. "This was another exceptional year for Stamps.com with strong execution in all of our business areas. ***During 2016 we continued to see the benefits from our 2014 acquisitions of ShipStation and ShipWorks, and we successfully integrated and realized synergies from our 2015 acquisition of Endicia. During 2016 we completed our acquisition of ShippingEasy and began the integration of that exciting new business as well. Across all of our products and services, we are realizing synergies in sales and marketing, operations, customer service, and product development***, and we believe that we have built a strong platform for pursuing all of our target customers. We are very excited about our opportunities in 2017 and beyond."

177.   The February 23, 2017 press release also reported the Company's fourth quarter 2016 financial results:

> Fourth quarter 2016 total revenue was $105.9 million, up 52% compared to the fourth quarter of 2015. ***Fourth quarter 2016 Mailing and Shipping revenue (which includes service, product and***

*insurance revenue but excludes Customized Postage and Other revenue) was $102.3 million, up 52% versus the fourth quarter of 2015.* Fourth quarter 2016 Customized Postage revenue was $3.6 million, up 34% versus the fourth quarter of 2015.

Fourth quarter 2016 GAAP income from operations was $41.4 million and GAAP net income was $29.0 million. GAAP net income per share was $1.61 based on 18.0 million fully diluted shares outstanding. This compares to a fourth quarter 2015 GAAP loss from operations of $1.0 million and a GAAP net loss of $0.1 million or $0.00 per share based on fully diluted shares outstanding of 16.6 million. Fourth quarter GAAP income from operations, GAAP net income and GAAP income per fully diluted share percent changes on a year-over-year basis are not meaningful given the GAAP net loss in the fourth quarter of 2015.

223.   During the Company's earnings call that day, McBride stated:

The average monthly revenue for paid customer or ARPU was $50.44 in the fourth quarter. That was up 43% versus the fourth quarter of 2015. *Growth in the ARPU likewise benefited from the continued growth in our shipping business. For shippers, we're able to increase ARPU above the baseline monthly service fee with partnership revenue share agreements that allow us to monetize the customer's package volume. Traditional small business office users do a minimal amount of shipping, so we did not have that component in our ARPU when our focus was more on that segment historically.*

*Our ARPU has increased 110%, since 2013 and that's partly the result of the fact that the customers we acquired via our acquisitions of ShipStation, ShipWorks and Endicia and ShippingEasy are all shipping focused.* Postage printed through all of our various products and services was $1.6 billion in the fourth quarter that was up 53% versus the fourth quarter of 2015.

\*       \*       \*

With that, let me just mention about the USPS. They are always and have been always our most important partner. *We have a common goal with the USPS which is growing package volume and serving*

*and retaining USPS customers*. We've made significant investments in creating, developing and growing the online mailing and shipping category since 1999.

We've invested more than $1.5 billion from 1999 through 2016 in customer service and support, research and development, sales and marketing, technology, infrastructure, product development and other areas. ***And all that's gone into support of helping the USPS grow their business and retain their customers.*** We've had over 15 billion in cumulative postage printed through our solutions since we launched in 1999.

USPS recently reported that they processed and delivered a record volume of packages during the 2016 holiday season and for the entire quarter. USPS stated when they reported their fiscal 2016 result last fall, they continue to win e-commerce customers, grow their package delivery business and they delivered more e-commerce packages to the home than any other shipper because of their application service, their enhanced visibility and competitive pricing. ***And we continue to enjoy a great partnership with the USPS. We feel that we've created a sustainable win-win model both of us that will result in the continued growth of USPS packages.***

178.   Huebner later added:

Long-term outlook, we've achieved a significant transformation of our business over the past few years with our acquisitions and focus on shipping. ***Our mailing and shipping business model with recurring revenue and high margin is very attractive and sustainable business model.***

***We are very well positioned to capitalize on the shipping opportunities in our business.*** We expect our long-term growth rates to naturally benefit from the growth in e-commerce, which has been growing at about 15% year-over-year recently. In addition, we believe there are opportunities for us to grow in excess of e-commerce growth rates through increased deduction of our multi-carrier and technology solutions.

*     *     *

*And just to add in terms of the monetization, the context we talked about it is in the small business customer. They're primarily on the flat rate subscription service and we might get a couple bucks from store purchase, whereas the shipper who are doing much higher volume, the value propositions much greater, the revenue model supposed to being all fixed price, it creates opportunities for us to earn revenue on package volume.*

*So that's the reason the ARPU is increasing and talked about.* So I think the way we look at it as we grow shipping, which that growth can come from getting new customers or existing customers, increasing their volume, the revenue and ARPU benefit from that. So we look at it more as we grow shipping, the monetization resulting in the higher ARPU is a natural byproduct of focusing on growing the package volume.

179. The statements in ¶¶ 176-178 above were each false and misleading when made. The true facts, which were then known to, or recklessly disregarded by the Section 10(b) Defendants, were:

a.      that (i) "the "benefits from [Stamps.com's] 2014 acquisitions of ShipStation and ShipWorks," (ii) the "synergies" from Stamps.com's 2015 acquisition of Endicia; and (iii) the "synergies" obtained in shipping in sales and marketing operations were substantially due to Stamps.com's unsustainable reseller scheme to bundle small-volume shippers and skim profits from the USPS;

b.      that Stamps.com's ability "to increase ARPU above baseline monthly service fee with partnership revenue share agreements that allow us to monetize the customer's package volume" depended upon the same reseller

scheme, which was contrary to Stamps.com's contractual relationships with the USPS and USPS policy;

      c.     that Stamps.com did not have a "common goal" with the USPS and was not in a "great partnership with USPS" nor were Stamps.com's business practices a "sustainable win-win model." Rather, the USPS was opposed to Stamps.com's actions, which violated both the terms and the spirit of the parties' contractual agreements;

      d.     that Stamps.com was engaged in a wrongful course of business whereby Stamps.com, in contravention of USPS governance and its contractual relationship with the USPS, was cannibalizing existing USPS customers and skimming profits from the USPS, which practices were adversely impacting the USPS and placing Stamps.com's USPS Commission Agreement and back-end agreements with Resellers in jeopardy; and

      e.     each of the facts set forth at ¶ 171(g)-(m) above.

180.  On March 1, 2017, the Company filed its 2016 Form 10-K ("2016 10-K") with the SEC. The 2016 10-K was signed by Defendants McBride, Ananda, Habiger, Jones, Samuels and Huebner, and contained substantially similar language as present in the 2015 10-K with respect to how the Company earned services revenue. In pertinent part, the 2016 10-K stated,

> (4) we may earn compensation by offering customers a discounted postage rate that is provided to the customers by our integration

partners; and (5) we may earn other types of revenue shares or other compensation from specific customers or integration partners.[51]

181.   Once again, the above disclosure was false and misleading when made because the 2016 10-K did not disclose or provide any information on the economics as to Stamps.com's side agreements with Resellers or the amount of revenues Stamps.com generated from these arrangements.

182.   The 2016 10-K also included the following among its disclosed risk factors:[52]

**The USPS could modify or terminate agreements and other financial compensation arrangements.**

The USPS could decide to amend, renegotiate or terminate agreements or financial compensation arrangements that exist now or in the future. For instance, if the USPS decides to amend, renegotiate or terminate our credit card cost sharing agreements, which govern the allocation of credit card fees paid by the USPS and us, our revenues and operating results could suffer. ***In addition, if the USPS decides to amend or renegotiate our arrangements under which we are compensated directly by the USPS for shipping customers or integration partners who print a certain amount of postage, our revenue and operating results may be negatively impacted. If the USPS decides to terminate our agreements or our integration partners' agreements under which we are compensated directly or indirectly by the USPS or integration partners for shipping customers who print a certain amount of postage, our revenue and operating results would suffer.***

---

[51] 2016 10-K at 37.
[52] 2016 10-K at 23.

**The USPS could modify or terminate discounts our customers receive.**

The USPS could decide to amend or terminate the discounts our customers and integration partners receive. Customers using our services receive discounted postage rates, either from Stamps.com or from integration partners that provide discounted rates, compared to USPS retail rates on certain mail pieces such as First Class letters and packages, domestic and international Priority Mail and Priority Mail Express packages, and other discounts available to high-volume shipping customers. We also earn compensation by offering customers a discounted postage rate that is provided to the customers by our integration partners. *If the USPS decides to withdraw certain discounts or even remove the discounts entirely, our revenue and operating results will suffer. If the Postal Regulatory Commission decides the discounts are unlawful and require the USPS to cancel or change them, then our revenue and operating results would suffer.*

a.    The above risk disclosure was materially false and misleading because it failed to disclose that the Officer and Director Defendants were causing the Company to engage in a wrongful course of business whereby Stamps.com, in contravention of its contractual relationship with the USPS, was cannibalizing existing USPS customers and skimming profits from the USPS, which practices were adversely impacting the USPS and placing Stamps.com's USPS Commission Agreement and back-end agreements with Resellers in jeopardy.  It also was false and misleading for each of the reasons set forth at ¶ 171(g)-(m) above.

183.   On May 3, 2017, Stamps.com a press release announcing its financial results for the first quarter of 2017. The press release stated in part:

"We are very pleased with our continued strong revenue and earnings growth this quarter," said Ken McBride, Stamps.com's chairman and CEO. ***"In addition to our overall revenue and earnings growth, during the first quarter we reached our highest level of paid customers, we saw continued strong growth in our shipping business areas, and we experienced strong contributions from all of our subsidiaries.*** We remain very excited about our future prospects and, combined with our first quarter performance, led us to increase our guidance for 2017."

184.   The May 3, 2017 press release also reported the Company's first

quarter 2017 financial results:

First quarter 2017 total revenue was $105.0 million, up 28% compared to the first quarter of 2016. ***First quarter 2017 Mailing and Shipping revenue (which includes service, product and insurance revenue but excludes Customized Postage and Other revenue) was $102.6 million, up 30% versus the first quarter of 2016.*** First quarter 2017 Customized Postage revenue was $2.4 million, down 7% versus the first quarter of 2016.

First quarter 2017 GAAP income from operations was $34.6 million and GAAP net income was $33.1 million. GAAP net income per share was $1.82 based on 18.2 million fully diluted shares outstanding. This compares to first quarter 2016 GAAP income from operations of $22.2 million and GAAP net income of $13.2 million or $0.71 per share based on fully diluted shares outstanding of 18.7 million. First quarter 2017 GAAP income from operations, GAAP net income and GAAP income per fully diluted share increased by 56%,150% and 157% year-over- year, respectively.

185.   During the Company's earnings call that day, McBride stated:

The average monthly revenue or ARPU was $47.36 in the first quarter and that was up 17% versus the first quarter of 2016. Growth in ARPU is likewise benefiting from the continued growth in the shipping business. ***For the shipping area, we're able to increase ARPU above the baseline monthly service fee with partnership rev share agreements that allow us to monetize the customer's package volume. Traditional small business office users do a minimal***

***amount of shipping, so we don't have that component in our ARPU when our focus was more on that segment historically.***

Let me talk a little bit about the USPS. The USPS has always been one of our most important partners. ***We both have the common goal of growing USPS package volume and serving and retaining USPS customers.*** We made significant investments in creating, developing and growing the online mailing and shipping category since 1999. To date, we've invested more than [$]1.5 billion in customer service and support, research and development, sales and marketing, technology, infrastructure, product development and other areas in support of helping the USPS grow their business and retain customers.

We have generated over $30 billion in cumulative postage printed through all of our brands since the industry first began in 1999, including over $5.5 billion last year in 2016. Last year, the USPS reported 16% growth in its shipping and package revenue for 2016. The overall package industry, on the other hand, grew only 8% domestically. When adding together the domestic shipping revenue of the big 3 carriers, which are the vast majority of the industry.

So the USPS is growing 2x faster than the overall industry. They're gaining significant market share versus of the private carriers. They're generating their extraordinary growth and market share gains by growing in e-commerce, which of course, is the key battle ground in shipping right now. It sets them up well for the future. ***We continue to enjoy a great partnership with USPS and feel that we have created a sustainable win-win model for both of us, which will result in the continued growth of USPS packages, in e-commerce and more generally.***

As you would expect, given the extraordinary growth they're generating, ***the USPS is very happy with their overall strategies, their partnerships and the business models they are pursuing in shipping. In particular, the USPS is very happy with the very successful partnership Stamps.com has together with the Postal Service, and that's based on very recent ongoing conversations we have with the most senior executives there.***

186.   In response to an analyst question during the earnings call concerning "the economics of the relationships you have, whether it's with the USPS or other partners, that would prompt some conservatives on guidance," McBride further reassured investors, stating:

> Yeah, there's nothing that points you specifically, and of course, we wouldn't be disclosing specifics of the partnerships, but it's just the same approach we've taken in years past and we don't really expect any material changes to any kind of the underlying economics or the revenue share agreements that we have.

187.   On the same call, in response to analyst questions concerning the Company's relationship with the USPS and whether the "USPS had sent a letter around to the participants in the reseller program with some potential changes." McBride further stated:

> ***There was no letter. The rumor is false.*** I mean, I think I tried to point out some of the broad global understanding of what the USPS and the partnerships they've done and the revenue share they've offered out to us and the reseller and the e-commerce industry, in general. ***And I think that one of the key things to focus on is are they being successful or not and therefore, are they going to make changes or not. And when you look at the big numbers, I mentioned they're growing at 16 % last year. They're outgrowing the industry by 2x. And so, USPS is having a ton of success in e-commerce, particularly,*** and so, in their shoes, you've got to ask yourself would you make a major change when you're growing twice the industry rate. *They're very happy with how things have gone.  The revenue shares they've offered to the industry, to e-commerce, have generated a lot of activity focused on them.* They're winning the e-commerce marketplace and they're being very successful doing it. USPS is very happy with the approach they've taken in business model and ***they're happy with the relationship with Stamps.com. We talk to them constantly, to the most senior folks there, so we're happy and they're***

*happy.* And what the letter information that's been propagated, we believe is part of the strategy with our stock. So it's not true.

188.   The statements in ¶¶ 183-187 above were each false and misleading when made.  The true facts, which were then known to, or recklessly disregarded by the Section 10(b) Defendants, were:

a.   that Stamps.com was not generating "continued strong growth in [its] shipping business," nor was it "experienc[ing] strong contributions from all of [its] subsidiaries." Rather, Stamps.com was engaged in an unsustainable reseller scheme to bundle small-volume shippers and skim profits from the USPS;

b.   that Stamps.com's "ab[ility] to increase ARPU above the baseline monthly service fee with partnership rev share agreements that allow us to monetize the customer's package volume" depended upon the same reseller scheme, which was contrary to Stamps.com's contractual relationships with the USPS and USPS policy;

c.   that Stamps.com was not in a "great partnership with USPS" nor were Stamps.com's business practices a "sustainable win-win model" or the USPS "happy with the relationship with Stamps.com." Rather, the USPS was opposed to Stamps.com's actions, as they violated both the terms and the spirit of the parties' contractual agreements;

d.   that the USPS was not "very happy with" Stamps.com, its "approach" or its "business model," nor were Stamps.com and the USPS working

in a "very successful partnership" together. In fact, Stamps.com was engaged in a wrongful course of business whereby the Company, in contravention of USPS governance and its contractual relationship with the USPS, was cannibalizing existing USPS customers and skimming profits from the USPS, which practices were adversely impacting the USPS and placing Stamps.com's USPS Commission Agreement and back-end agreements with Resellers in jeopardy;

        e.    that Stamps.com's Board █████████████████████ ████████████████████████████████████████████████████ ████████;

        f.    that, beginning no later than February 2016, the USPS had put Resellers on notice that cannibalization of USPS customers an improper use of the Reseller Program;

        g.    that contrary to its contractual relationship with the USPS and USPS policy, Stamps.com was using its ShipStation, ShipWorks, Endicia and ShippingEasy platforms, plus its arrangements with other Resellers, to aggregate low volume customers in order to improperly obtain discounted USPS rates available only to high volume shippers, and then to appropriate a substantial portion of that discount for its own benefit;

h.   ███████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████;

i.      that Stamps.com's strong financial results were dependent on the manipulation of a USPS Reseller Program that improperly benefited Stamps.com at the expense of the USPS, which was losing an estimated $235 million per year as a result of Stamps.com's misuse of the Reseller Program;

j.      that Stamps.com concealed the truth about its reseller scheme and instead repeatedly publicly represented that its purportedly strong financial performance was the result of the Company's strong relationship with the USPS; and

k.      that Stamps.com's reseller scheme represented a significant financial risk to Stamps.com's lucrative exclusive partnership with the USPS and its back-end agreements with Resellers.

189.  On August 2, 2017, Stamps.com issued a release announcing its financial results for the second quarter of 2017.  The press release stated in part:

"We are very pleased with the continued strength of our financial performance this quarter," said Ken McBride, Stamps.com's Chairman and CEO. "In addition to our strong revenue and earnings growth during the second quarter, we reached our highest level of paid customers *and average revenue per paid customer, we saw continued strong growth in our shipping business areas, and we experienced strong contributions from all of our subsidiaries*. We remain very excited about our future business opportunities which, combined with

our second quarter performance, led us to increase our guidance for 2017.

190.   The August 2, 2017 press release also reported the Company's second

quarter 2017 financial results:

> Second quarter 2017 total revenue was $116.1 million, up 38% compared to the second quarter of 2016. ***Second quarter 2017 Mailing and Shipping revenue (which includes service, product and insurance revenue but excludes Customized Postage and Other revenue) was $111.8 million, up 37% versus the second quarter of 2016.*** Second quarter 2017 Customized Postage revenue was $4.3 million, up 73% versus the second quarter of 2016.

> Second quarter 2017 GAAP income from operations was $41.7 million and GAAP net income was $31.0 million. GAAP net income per share was $1.71 based on 18.1 million fully diluted shares outstanding. This compares to second quarter 2016 GAAP income from operations of $25.0 million and GAAP net income of $14.3 million or $0.79 per share based on fully diluted shares outstanding of 18.2 million. Second quarter 2017 GAAP income from operations, GAAP net income and GAAP income per fully diluted share increased by 67%, 117% and 118% year-over-year, respectively.

191.   During the Company's earnings call that day, McBride stated the

following concerning Stamps.com's relationship with the USPS:

> Resellers are important both for keeping existing business and for growing new business.  ***You have people that are shipping through the reseller channel. It works for the USPS.*** And if they aren't shipping with the USPS, going after some of that business, also works for USPS.  The USPS have to continue to serve customers and to find new customers.

> The reseller business is growing to the tune that the USPS reseller program is and is providing solutions down-market where the USPS doesn't have the sales team to interact. ***The USPS doesn't see any reason why the program wouldn't continue to serve both customers and the needs of the Postal Service going forward. Finally, the***

> *USPS looked at resellers and PC postage providers like Stamps.com and Endicia as excellent partners on bringing the best solutions to customers.*
>
> *We continue to enjoy a great partnership with the Postal Service and feel that we've created a sustainable win-win model for both of us, which will result in a continued growth of USPS packages and e-commerce and online postage more generally.*
>
> *      *      *
>
> [T]he partnership with the Postal Service is continuing to be stronger and stronger and some of the – we have multiple contracts and various partnerships with the Postal Service. And so in this case, we were able to get a couple of our contracts renewed at improved terms. So we were just trying to give people an insight to ***the relationship with the Postal Service continues to get healthier and healthier.***

192.   On the same call, Huebner stated the following concerning the Company's relationship with the USPS:

> *I would just say, I mean, we've been saying over the last year that it's a win-win partnership. And so, the more successful we both are in helping the USPS compete, then I think that benefits both of us, and so I think it was really meant to highlight the win-win nature of the partnership and how both sides are succeeding.*

193.   The statements in ¶¶ 189-192 above were each false and misleading when made.  The true facts, which were then known to, or recklessly disregarded by the Section 10(b) Defendants, were:

a.      that Stamps.com and the USPS were not in "a sustainable win-win model" and the relationship between the two was not "a great partnership," "get[ting] healthier and healthier," "continu[ing] to be stronger and stronger," and Stamps.com and its affiliates were not being looked at as "excellent partners."

95

Rather, Stamps.com was actively engaged in its deceptive reseller scheme to bundle small-volume shippers and skim profits from the USPS, which practices were adversely impacting the USPS and placing Stamps.com's USPS Commission Agreement and back-end agreements with Resellers in jeopardy; and

b.      the undisclosed facts set forth at ¶ 188(e)-(k) above.

194.   On November 2, 2017, Stamps.com issued a release announcing its financial results for the third quarter of 2017. The press release stated in part:

> "We are very pleased with our third quarter financial performance," said Ken McBride, Stamps.com's Chairman and CEO. "We achieved strong performance in our financial and customer metrics in a quarter that is both seasonally slower and one in which we saw the anniversary of our most recent acquisition. ***Our shipping business continues to drive our solid top line results and strong margin profile through contributions from each of our shipping subsidiaries.***"

> We believe we are well positioned as we enter the seasonally strong fourth quarter and we remain very excited about our long-term business opportunities."

195.   The November 2, 2017 press release also reported the Company's third quarter 2017 financial results:

> Third quarter 2017 total revenue was $115.1 million, up 24% compared to the third quarter of 2016. ***Third quarter 2017 Mailing and Shipping revenue (which includes service, product and insurance revenue but excludes Customized Postage and Other revenue) was $106.5 million, up 21% versus the third quarter of 2016.*** Third quarter 2017 Customized Postage revenue was $8.6 million, up 75% versus the third quarter of 2016.

> Third quarter 2017 GAAP income from operations was $35.7 million and GAAP net income was $46.2 million. GAAP net income per

share was $2.49 based on 18.5 million fully diluted shares outstanding. This compares to third quarter 2016 GAAP income from operations of $31.6 million and GAAP net income of $18.7 million or $1.03 per share based on 18.1 million fully diluted shares outstanding. Third quarter 2017 GAAP income from operations, GAAP net income and GAAP income per fully diluted share increased by 13%, 148% and 142% year-over-year, respectively.

196.   During the Company's earnings call that day, McBride stated:

***Growth in ARPU benefitted from the continued growth in our shipping business because those customers pay higher subscription fees and we collect additional partnership revenue share in that area.*** Total postage printed through all our solutions was 1.4 billion in the third quarter and that was up 8% versus the third quarter of 2016. We would note that the total postage growth includes slower growth traditional mail postage, as well as the higher growth shipping postage. Our management team and all of our employees are very proud of the continued financial and business success we've generated for our shareholders

… They're [USPS] very strong in e-commerce, very strong in residential delivery, and then very strong in smaller packages. So – and I think we're pleased to see the continued trend on the USPS. ***As you know, we succeed when they succeed.*** So we were happy with the percentages we saw.

197.   The statements in ¶¶ 194-196 above were each false and misleading when made.  The true facts, which were then known to, or recklessly disregarded by the Section 10(b) Defendants, were:

a.     that the "solid top line results and strong margin profile" in Stamps.com's shipping business, along with its "growth in ARPU," "higher subscription fees and … additional partnership revenue share" were substantially due to Stamps.com's active engagement in its deceptive reseller scheme to bundle

small-volume shippers and skim profits from the USPS, which practices were adversely impacting the USPS and placing Stamps.com's USPS Commission Agreement and back-end agreements with Resellers in jeopardy;

       b.    that Stamps.com was not "well positioned" for the same reason; and

       c.    the undisclosed facts set forth at ¶ 188(e)-(k) above.

198.   On February 21, 2018, Stamps.com issued a release announcing its four quarter and year-end 2017 financial results. The release stated in part:

> "We are pleased with our fourth quarter and fiscal 2017 financial performance," said Ken McBride, Stamps.com's Chairman and CEO. ***"We achieved strong financial results driven by exceptional performance in our shipping business. We believe we are well positioned for 2018 and we remain excited about our long-term business opportunities."***

199.   The February 21, 2018 press release also reported the Company's fourth quarter 2017 financial results:

> Fourth quarter 2017 total revenue was $132.5 million, up 25% compared to the fourth quarter of 2016. ***Fourth quarter 2017 Mailing and Shipping revenue (which includes service, product and insurance revenue but excludes Customized Postage and Other revenue) was $128.5 million, up 26% versus the fourth quarter of 2016.***

> Fourth quarter 2017 Customized Postage revenue was $3.9 million, up 9% versus the fourth quarter of 2016. Fourth quarter 2017 GAAP income from operations was $51.5 million, GAAP net income was $40.2 million and GAAP net income per share was $2.15 based on 18.7 million fully diluted shares outstanding. This compares to fourth quarter 2016 GAAP income from operations of $41.4 million, GAAP

net income of $29.0 million and GAAP net income per share of $1.61 based on 18.0 million fully diluted shares outstanding. Fourth quarter 2017 GAAP income from operations, GAAP net income and GAAP income per fully diluted share increased by 24%, 38% and 34% year-over-year, respectively.

200.   During the Company's earnings call that day, McBride stated:

The average monthly revenue per paid customer or ARPU was $58.28 in the fourth quarter, that was up 16% versus the fourth quarter of 2016. The growth in APRU benefited from continued growth in the shipping focused areas of our business. ***Shipping customers generally pay higher subscription fees than small businesses. In addition, we collect additional partner revenue share payments and commissions tied to the dollar volume of packages that we process on behalf of our shipper.***

201.   Later during the call, Huebner stated:

Thanks, Jeff. With our increased focus on shipping, and our four company acquisitions, we've achieved a significant transformation in our business over the past five years. We expect our focus to be -- continue to be on shipping for the foreseeable future. ***We are very well positioned to capitalize on e-commerce shipping opportunities.*** Growth in ecommerce provides the natural base line tailwind to our growth and e-commerce growth in the U.S. has been running in the mid to high-teens.

202.   The statements in ¶¶ 198-201 above were each false and misleading when made. The true facts, which were then known to, or recklessly disregarded by the Section 10(b) Defendants, were:

a.      that Stamps.com was not "well positioned for 2018," but rather, its most important long-term business opportunity was unraveling, as Stamps.com was engaged in a wrongful course of business whereby Stamps.com, in contravention of USPS governance and its contractual relationship with the USPS,

was cannibalizing existing USPS customers and skimming profits from the USPS, which practices were adversely impacting the USPS and placing Stamps.com's USPS Commission Agreement and its back-end agreements with Resellers in jeopardy;

b.     that the "exceptional performance in [Stamps.com's] shipping business, in which "[s]hipping customers generally pay higher subscription fees than small business" and Stamps.com's collection of "additional partner revenue share payments and commissions" was substantially due to the same deceptive practices;

c.     the undisclosed facts set forth at ¶ 188(e)-(k) above.

203.   On February 28, 2018, the Company filed its 2017 Form 10-K ("2017 10-K") with the SEC.   The 2017 10-K was signed by Defendants McBride, Carberry, Ananda, Habiger, Jones and Samuels, and contained the same disclosure present in the 2016 10-K with respect to how the Company earned services revenue. In pertinent part, the 2017 10-K stated,

> (4) we may earn compensation by offering customers a discounted postage rate that is provided to the customers by our integration partners; and (5) we may earn other types of revenue shares or other compensation from specific customers or integration partners.[53]

---

[53] 2017 10-K at 38.

204.   The 2017 10-K also included the following among its disclosed risk

factors: [54]

**The USPS could modify or terminate agreements and other
financial compensation arrangements, which would have an
adverse effect on our revenues and operating results.**

The USPS could decide to amend, renegotiate or terminate
agreements or financial compensation arrangements that exist now or
in the future. For instance, if the USPS decides to amend, renegotiate
or terminate our credit card cost sharing agreements, which govern the
allocation of credit card fees paid by the USPS and us, our revenues
and operating results would suffer. ***In addition, if the USPS decides
to amend or renegotiate our arrangements under which we are
compensated directly by the USPS for shipping customers or
integration partners who print a certain amount of postage, our
revenue and operating results may be negatively impacted. If the
USPS decides to terminate our agreements or our integration
partners' agreements under which we are compensated directly or
indirectly by the USPS or integration partners for shipping
customers who print a certain amount of postage, our revenue and
operating results would suffer.***

**The USPS or our integration partners could cause discounts our
customers receive to be diminished or terminated, which would
have an adverse effect on our results of operations, reputation and
competitiveness.**

The USPS could decide to amend or terminate the discounts our
customers and integration partners receive. ***Customers using our
services receive discounted postage rates, either from Stamps.com or
from integration partners that provide discounted rates, compared to
USPS retail rates*** on certain mail pieces such as First Class letters and
packages, domestic and international Priority Mail and Priority Mail
Express packages, and other discounts available to high-volume
shipping customers. We also earn compensation by offering

---

[54] 2017 10-K at 27.

customers a discounted postage rate that is provided to the customers by our integration partners. ***If the USPS decides to withdraw certain discounts or even remove the discounts entirely, our revenue and operating results will suffer. If the Postal Regulatory Commission decides the discounts are unlawful and require the USPS to cancel or change them, then our revenue and operating results would suffer.*** These discounts are subject to terms and conditions of agreements between third parties and the USPS, and there can be no assurance that our integration partners will continue to have access to such discounts or that they will continue to make them available to our customers on favorable terms or at all. Any disruption to our ability to provide discounts to our customers could have a material adverse effect on our results of operations, reputation and competitiveness.

205.   The above risk disclosure was materially false and misleading because it failed to disclose that the Officer and Director Defendants were causing the Company to engage in a wrongful course of business whereby Stamps.com, in contravention of USPS governance and its contractual relationship with the USPS, was cannibalizing existing USPS customers and skimming profits from the USPS, thereby placing thereby placing Stamps.com's agreement with the USPS, which practices were adversely impacting the USPS and placing Stamps.com's USPS Commission Agreement and back-end agreements with Resellers in jeopardy. Also, the 2017 Form 10-K was false and misleading for failing to disclose each of the facts set forth at ¶ 188(e)-(k) above.

206.   On May 3, 2018, Stamps.com issued a release announcing its financial results for the first quarter of 2018.  The press release stated in part:

"We were very pleased with our first quarter performance," said Ken McBride, Stamps.com's Chairman and CEO. **"We achieved strong growth driven by continued success in the shipping area of our business.** We are continuing to execute on our 2018 strategic plans and we remain excited about our long-term business opportunities."

207.   The May 3, 2018 release also reported the Company's first quarter 2018 financial results:

First quarter 2018 total revenue was $133.6 million, up 27%compared to the first quarter of 2017. ***First quarter 2018 Mailing and Shipping revenue (which includes service, product and insurance revenue but excludes Customized Postage and Other revenue) was $131.0 million, up 28% versus the first quarter of 2017.*** First quarter 2018 Customized Postage revenue was $2.6 million, up 6% versus the first quarter of 2017.

First quarter 2018 GAAP income from operations was $49.2 million, GAAP net income was $47.0 million and GAAP net income per share was $2.54 based on 18.5 million fully diluted shares outstanding. This compares to first quarter 2017 GAAP income from operations of $34.6 million, GAAP net income of $33.1 million and GAAP net income per share of $1.82 based on 18.2 million fully diluted shares outstanding. First quarter 2018 GAAP income from operations, GAAP net income, and GAAP income per fully diluted share increased by 42%, 42% and 39% year-over-year, respectively.

208.   During the earnings call that day McBride stated:

The average monthly revenue per paid customer or ARPU was $58.96 in the first quarter and that was up 21% versus the first quarter of 2017. ***The growth in the APRU benefited from continued growth in the shipping focused areas of our business. Shipping customers generally pay higher subscription fees than small businesses or particularly also collected additional partner rev share, payments and commissions tied to the dollar volume of packages that we process on behalf of our shippers.***

\*       \*       \*

 [W]e continue to focus on how to create value for the USPS, ***how to help them be successful in the e-commerce package market.*** And so to the extent that we are successful in creating value and helping the USPS be successful in that part of the market, ***then those create the type of long-term partnership opportunities that we've seen over the past decade.***

209.   Huebner added:

Thanks, Jeff. With our increased focus on shipping, and our four acquisitions, we've achieved a significant transformation in our business over the past five years. ***We expect to continue to focus our efforts on shipping for the foreseeable future. We are very well positioned to capitalize on e-commerce shipping opportunities.*** Growth in e-commerce provides a natural base line tailwind to our growth and e-commerce year-over-year growth in the US has been running in the mid to high-teens.

We have demonstrated the ability to grow our shipping related revenue above the typical e-commerce growth rates for several reasons. First, our solutions are suitable for the largest e-commerce sellers that need the sophisticated solutions which we provide and as we attract the largest and most successful e-commerce companies into our suite of solutions effectively skimming the cream at the top, creaming off the top of the universe of e-commerce sellers.

Second, we are expanding the scope of what we offer outside the traditional areas of shipping and into new e-commerce features including things like inventory management and customer marketing that Ken mentioned earlier. Third, we are expanding our international solutions both for domestic US volume going to international destinations and for international customers using our solutions to ship within and outside their countries.

Fourth, with our multi-carrier platforms, we are able to expand outside of our traditional core USPS focused business with new relationships and new potential revenue sharing opportunities with other carriers.

210.   The statements in ¶¶ 206-209 above were each false and misleading when made.  The true facts, which were then known to, or recklessly disregarded by the Section 10(b) Defendants, were:

a.      that the "strong growth" driven by continued success in the shipping area of [Stamps.com's] business" was substantially due to Stamps.com, in contravention of USPS governance and its contractual relationship with the USPS, cannibalizing existing USPS customers and skimming profits from the USPS, which practices were adversely impacting the USPS and placing Stamps.com's USPS Commission Agreement and back-end agreements with Resellers in jeopardy;

b.      that the "growth in ARPU" in the "shipping focused areas of [Stamps.com's] business," in which "[s]hipping customers generally pay higher subscription fees than small business" and Stamps.com's collection of "additional partner revenue share payments and commissions…" was substantially due to the same deceptive practices;

c.      that, rather than being "focus[ed] on how we create value for the USPS," Stamps.com was actively engaged in its deceptive reseller scheme to bundle small-volume shippers and skim profits from the USPS;

d.      that, contrary to the reasons given by Huebner, Stamps.com's ability to grow shipping related revenue was substantially due to its deceptive Reseller practices;

e.      ████████████████████████████████████ ████████████████████████████████████ ████████████;

f.      that, beginning no later than February 2016, the USPS had put Resellers on notice that cannibalization of USPS customers an improper use of the Reseller Program;

g.      that contrary to its contractual relationship with the USPS and USPS policy, Stamps.com was using its ShipStation, ShipWorks, Endicia and ShippingEasy platforms, plus its arrangements with other Resellers, to aggregate low volume customers in order to improperly obtain discounted USPS rates available only to high volume shippers, and then to appropriate a substantial portion of that discount for its own benefit;

h.      ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████;

i.      that Stamps.com's strong financial results were dependent on the manipulation of a USPS Reseller Program that improperly benefited

Stamps.com at the expense of the USPS, which was losing an estimated $235 million per year as a result of Stamps.com's misuse of the Reseller Program;

j.    that Stamps.com concealed the truth about its reseller scheme and instead repeatedly publicly represented that its purportedly strong financial performance was the result of the Company's strong relationship with the USPS; and

k.    that Stamps.com's reseller scheme represented a significant financial risk to Stamps.com's lucrative exclusive partnership with the USPS and its back-end agreements with Resellers.

211.   On August 2, 2018, Stamps.com issued a press release announcing its financial results for the second quarter of 2018. The press release stated in part:

> "We were very pleased with our acquisition of MetaPack and with our second quarter performance," said Ken McBride, Stamps.com's Chairman and CEO. ***"Our growth continues to be driven by success in the shipping area of our business.*** With MetaPack we will be able to accelerate our focus on international expansion, and will be in a much better position to address the global e-commerce shipping industry. We are continuing to execute on our operational and strategic plans and we are excited about our long-term business opportunities."

212.   The August 2, 2018 press release also reported the Company's second quarter 2018 financial results:

> Second quarter 2018 total revenue was $139.6 million, up 20% compared to the second quarter of 2017. ***Second quarter 2018 Mailing and Shipping revenue (which includes service, product and insurance revenue but excludes Customized Postage and Other***

*revenue) was $134.4 million, up 20% versus the second quarter of 2017*.

Second quarter 2018 Customized Postage revenue was $5.2 million, up 22% versus the second quarter of 2017. Second quarter 2018 GAAP income from operations was $46.9 million, GAAP net income was $45.5 million, and GAAP net income per share was $2.41 based on 18.9 million fully diluted shares outstanding. This compares to second quarter 2017 GAAP income from operations of $41.7 million, GAAP net income of $31.0 million and GAAP net income per share of $1.71 based on 18.1 million fully diluted shares outstanding. Second quarter 2018 GAAP income from operations, GAAP net income, and GAAP income per fully diluted share increased by 12%, 47% and 41% year-over-year, respectively.

213.   During the Company's earnings call that day, McBride stated:

Average monthly revenue per paid customer or ARPU was $60.79 in the second quarter that was up 20% versus the second quarter of 2017. *The growth in ARPU benefited from continued growth in the shipping focused areas of our business,*

Shipping customers generally pay higher subscription fees than small business mailers. We're typically also collecting additional partner revenue share payments in commissions tied to the dollar volume of packages that we process on behalf of our shippers.

214.   Huebner added:

As demonstrated by our organic growth in shipping revenue to the second quarter and the mid 20% range year-over-year. We have shown an ability to grow stamp shipping related revenue above typical e-commerce growth rates for several reasons.

First, our solutions are suitable for the largest and most sophisticated e-commerce sellers. So we generally attract higher growth e-commerce companies. Second, we are expanding the scope of our offering and thereby increasing our customer monetization. Third, our multi-carrier platforms allow us to expand outside our traditional core USPS focused business.

215.  McBride also stated the following in response to analyst questions concerning the USPS Task Force investigation and impending report:

**Kevin Liu**

Got it. That's helpful. Switching gears a little bit with the Trump Task Force on the USPS ... Was wondering if you guys participated in any sort of conversations with the Task Force and if so is there anything you wouldn't heard from either those conversations or maybe the USPS OIGs report last month on kind of the postal partner ecosystem that would suggest any significant changes are coming?

**Ken McBride**

Yes, so the Task Force was formed and it's doing lots of interviews with all the various constituents out there We have spoken to the members of the Task Force several times the final report is expected to be issued August 10.  We don't know the specifics in their report, but you know, when you think that based on our conversations ***the report will you know come out strongly in favor of the partnerships between the USPS and private industry like the partnerships we've had with the USPS***.  So well be interested to see what comes out on the report on August 10.

216.  The statements in ¶¶ 211-215 above were each false and misleading when made.  The true facts, which were then known to, or recklessly disregarded by the Section 10(b) Defendants, were:

a.  that the "growth" … driven by success in the shipping area of [Stamps.com's] business" was substantially due to Stamps.com, in contravention of USPS governance and its contractual relationship with the USPS, cannibalizing existing USPS customers and skimming profits from the USPS, which practices

were adversely impacting the USPS and placing Stamps.com's USPS Commission Agreement and back-end agreements with Resellers in jeopardy;

b.     that the "growth in ARPU" in the "shipping focused areas of [Stamps.com's] business," in which "[s]hipping customers generally pay higher subscription fees than small business" and Stamps.com's collection of "additional partner revenue share payments and commissions…" was substantially due to the same deceptive practices;

c.     that, rather than being "focus[ed] on how we create value for the USPS," Stamps.com was actively engaged in its deceptive reseller scheme to bundle small-volume shippers and skim profits from the USPS;

d.     that, contrary to the reasons given by Huebner, Stamps.com's ability to grow shipping related revenue was substantially due to its deceptive reseller practices;

e.     ███████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ █████████████████████████████████████████████;

f.     that the USPS, rather than "increasingly embracing partnerships like ours [Stamps.com's]," in fact was seeking to end the cannibalization of revenue that took place due to Stamps.com's "partnership":

g.    the undisclosed facts set forth at ¶ 210(e)-(k) above.

217.   On August 8, 2018, Stamps.com issued a Form 10-Q that, for the first time disclosed that the USPS was seeking to renegotiate is agreements with Stamps.com.  The Form 10-Q included certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 signed by McBride and Carberry certifying that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."  Buried in a list of ten risk disclosures, the Form 10-Q disclosed the following:

> **The USPS could modify, discontinue or terminate agreements and other financial compensation arrangements, which would have an adverse effect on our revenues and operating results.**
>
> The USPS could decide to amend, renegotiate, discontinue or terminate one or more of our financial compensation arrangements that exist now or in the future. If the USPS decides to amend, renegotiate, discontinue or terminate any of our agreements or our integration partners' agreements under which we are compensated directly or indirectly by the USPS or integration partners for shipping customers who print a certain amount of postage, or our credit card cost sharing agreements which govern the allocation of credit card fees paid by the USPS and us, then our revenue and operating results would suffer. ***In the history of our relationship with the USPS, we have had many of these important agreements renewed only on short-term extensions and without assurances of any long-term commitments by the USPS. During the previous calendar quarter, the USPS provided a notice requiring the renegotiation of one of our important financial compensation arrangements. While we believe that this agreement is mutually beneficial to the USPS and to***

***us,*** there is a risk that renegotiation is unsuccessful and leads to materially less favorable terms ***or that the USPS decides to not renew one or more of these financial compensation arrangements.*** In such case, our revenue and operating results will be materially affected unless we are successful in timely replacing the lost revenue with similar compensation from other potential partners.

218.    The statements in ¶ 217 above were each false and misleading when made.  The true facts, which were then known to, or recklessly disregarded by the Section 10(b) Defendants, were:

a.



;

b.    that the USPS in fact was seeking to end the cannibalization of USPS revenue that was taking place due to Stamps.com's "partnership";

c.    that Stamps.com was engaged in a wrongful course of business whereby Stamps.com, in contravention of USPS governance and its contractual relationship with the USPS, was cannibalizing existing USPS customers and skimming profits from the USPS, which practices were adversely impacting the USPS and placing Stamps.com's USPS Commission Agreement and back-end agreements with Resellers in jeopardy; and

d.    the undisclosed facts set forth at ¶ 210(e)-(k) above.

219.   On October 31, 2018, Stamps.com issued a press release announcing its financial results for the third quarter of 2018.  The press release stated in part:

> "We are very pleased with our third quarter financial performance and with the successful closing of our acquisition of MetaPack," said Ken McBride, Stamps.com's Chairman and CEO. "We achieved strong organic performance in our financial metrics in a traditionally seasonally slower period. ***Our shipping business continues to drive our solid results through contributions from each of our shipping subsidiaries. We believe we are well positioned as we enter the seasonally strong fourth quarter and we remain very excited about our long-term business opportunities.***"

220.   The October 31, 2018 press release also reported the Company's third quarter 2018 financial results:

> Third quarter 2018 total revenue was $143.5 million, up 25% compared to the third quarter of 2017. ***Third quarter 2018 Mailing and Shipping revenue (which includes service, product and insurance revenue but excludes Customized Postage and Other revenue) was $136.5 million, up 28% versus the third quarter of 2017.*** Third quarter 2018 Customized Postage revenue was $7.0 million, down 19% versus the third quarter of 2017.
>
> Third quarter 2018 GAAP income from operations was $44.3 million, GAAP net income was $33.4 million, and GAAP net income per share was $1.75 based on 19.0 million fully diluted shares outstanding. This compares to third quarter 2017 GAAP income from operations of $35.7 million, GAAP net income of $46.2 million and GAAP net income per share of $2.49 based on 18.5 million fully diluted shares outstanding. Third quarter 2018 GAAP income from operations increased by 24%, and GAAP net income and GAAP income per fully diluted share decreased by 28% and 30% year-over-year, respectively.

221.   During the Company's earnings call that day, McBride stated:

> Our total paid customer metric was 732,000. Paid customers were down slightly versus the third quarter of 2017. The more modest

performance of paid customers in recent quarters is consistent with *our strategic shift to focusing on the acquisition of shippers, which are numerically fewer numbers but where each customer has a much higher lifetime value. With this shift in focus, our revenue has been more driven by growth in ARPU than it has been driven by growth in paid customers.*

\*      \*      \*

Shipping customers generally pay higher subscription fees than small business mailers. And we typically also collect additional partner revenue share payments, commissions and transaction fees tied to the packages that we process on behalf of our shippers.

222.   McBride also stated the following concerning the UPS Task Force Report and the status of Stamps.com's relationship with the USPS:

On the third issue of the recent office of Inspector General or OIG report, it has not been made public due to USPS concerns with the commercial sensitivity of competitive product pricing strategy in the report. And since we have also not seen the report, it's very difficult for us to comment. *That said; based on the title of the report, we would expect that the report is focused on Negotiated Service Agreements or NSAs that the USPS offers its customers and its partners in the package business.* The general goal of these types of OIG reports is specifically to review whether a program is meeting its legal criteria, which in the case of NSAs the legal criteria established is that each NSA much cover – must cover its cost and must contribute the legally required minimum of 5.5% of institutional costs.

As of the last review of the contribution, the contribution was well above this level. *And accordingly, we would have no reason to believe that the USPS is not generally meeting its obligations regarding the NSA program. We further expected any commentary in the report on postal partnerships would reflect the very positive effect that partnerships like ours have had on growth in the USPS's package volumes.*

\*      \*      \*

On the final issue of the negotiations of important agreements with the USPS, we would note the following general points. Historically, we have had a significant number of agreements with the USPS and we have negotiated those agreements many times. These types of negotiations are very common for us. Negotiations with the USPS often take many months to finalize. The USPS has many competing priorities and the process just takes time.

*In general, we expect that updates to our agreements with the USPS will continue to reflect the critical role that we play in their ecommerce package business, including that we have the largest private sales force focused on driving USPS growth, we process more than one-third of their priority mail volume in the U.S., and working hand-in-hand with the USPS through our partnership, we have contributed to a significant portion of overall USPS e-commerce package growth over the past five years.*

223.   In response to an analyst question during the earnings call concerning the OIG and USPS Task Force review, McBride stated:

I think when we look at the various reports that are out there, the conversations we've had with folks that are working on these reports, *the general view is the idea of USPS increasingly embracing partnerships like ours makes a ton of sense for them.*

224.   The statements in ¶¶ 219-223 above were each false and misleading when made.  The true facts, which were then known to, or recklessly disregarded by the Section 10(b) Defendants, were:

a.     that the "success in the shipping area of [Stamps.com's] business" was substantially due to Stamps.com, in contravention of USPS governance and its contractual relationship with the USPS, cannibalizing existing USPS customers and skimming profits from the USPS, which practices were

adversely impacting the USPS and placing Stamps.com's USPS Commission Agreement and back-end agreements with Resellers in jeopardy;

b.     that the "growth in ARPU" in the "shipping focused areas of [Stamps.com's] business," in which Stamps.com was "typically also collecting additional partner revenue share payments in commissions tied to the dollar volume of packages that we process on behalf of our shippers" was substantially due to the same deceptive practices;

c.     that the USPS, rather than "increasingly embracing partnerships like ours [Stamps.com's]," in fact was seeking to end the cannibalization of revenue was taking place due to Stamps.com's "partnership;"

d.     ███████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████;

e.     that, contrary to the reasons given by Huebner, Stamps.com's ability to grow shipping related revenue was substantially due to its deceptive reseller practices; and

f.     the undisclosed facts set forth at ¶ 210(e)-(k) above.

225.   On February 21, 2019, after the market closed, Stamps.com held a conference call to discuss its 2018 financial results as well as its business outlook

and "certain strategic items . . . that impact our business outlook for 2019."  During the call, McBride disclosed to investors for the first time that Stamps.com had ended its shipping partnership with the USPS and falsely represented that Stamps.com was the one which terminated it.

226.   The revelation stunned the market, which attempted to process the inexplicable announcement that the Company was simply walking away from a business relationship that had accounted for a significant portion of the Company's revenue and which the Company repeatedly touted to investors.  As a result of this news, the Company's stock price dropped by $114 per share on record trading volume of 13.7 million shares, from $198 per share to close at less than $84 per share on February 22, 2019, a decline of over **57%**.

227.   On May 8, 2019, Stamps.com further shocked investors by slashing its profit outlook for the full year, further fueling investor concerns about its ability to protect margins in the absence of a key partnership with the USPS.  During the earnings call that day.  McBride stated:

> ***Despite the success of the USPS reseller program, we have very recently become aware that the USPS is currently renegotiating the NSAs of several of our reseller partners.*** While these ongoing – our ongoing negotiations with uncertain outcomes and we have limited visibility given that the negotiations are being conducted solely between the USPS and the resellers. ***We believe that is reasonably likely that margins earned by resellers as a result of these negotiations will begin to decrease starting around the second half of 2019 and may continue to decrease in 2020 and 2021.*** Because we are one of the 125 organizations that have a revenue share

arrangement with the resellers, the expected decreases in margins earned by the resellers will also negatively impact our financial results.

We also expect that it will directly impact the financial results of many of those approximately 125 companies. ***With the less attractive revenue share, we believe many of these e-commerce solutions are going to shift their focus to other carriers.*** The USPS will likely lose a very large set of strong company allies and potentially stands to lose a large amount of volume. ***Their significant success in driving the USPS' business should have resulted in a reward, but instead is being met with a decrease in their economics.***

228. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ The Company further disclosed during the earnings call that it now expected a fiscal year 2019 non-GAAP adjusted income of $3.35 to $4.85 per share, down from its prior estimate of $5.15 to $6.15 per share.

229. As a result of this news, Stamps.com's stock price dropped another $46 per share, on record trading volume of 16.8 million shares, to close at $36,90 per share on May 9, 2019, a decline of over ***56%***. The two consecutive 50% slides in Stamps.com's share price following two consecutive quarterly announcements is extraordinary and took place in only two and a half months as the truth regarding Stamps.com's deteriorating relationship with the USPS reached the market.

230. As set forth below, the Section 10(b) Defendants misrepresentations caused Stamps.com to overpay for its common stock repurchases by **$279,142.215**.

E.    **Stamps.com's Improper Business Practices Were Central to Its Operations**

231.  Stamps.com's reseller scheme was central to the Company's business operations as the USPS accounted for at times approximately 87% of Stamps.com's revenue during the Relevant Period.  As a result of its partnership with the USPS, Stamps.com's revenues increased from $117 million to $567 million, a 486% increase from 2014 to 2018.

232.  As Stamps.com's ability to perpetuate its reseller scheme unraveled, Stamps.com's expected profits plummeted and the Company reported significant declines in revenue and earnings guidance as a result.

233.  Stamps.com's partnership with the USPS and use of its reseller rates to grow profits for the Company were fundamental and critically important parts of Stamps.com's business, ███████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████.

F.    **During These Events, the Board Inexplicably Approves Hundreds of Millions of Dollars of Stock Repurchases, While Insiders with Knowledge Sell**

234.  As described in detail above, the Director and Officer Defendants knew that the Company's business model approved by the Board was based on improperly skimming revenue from the USPS and was in jeopardy of falling apart.

During that time, certain Director Defendants and all of the Officer Defendants engaged in massive insider trading to profit personally.  Stamps.com insiders sold over a million shares of stock for proceeds of over $230 million.

235.   In order to sell the vast majority of their shares at inflated prices, the Board approved a massive expansion and continued maintenance of the Company's share buyback plan, $291 million in repurchases were made during the same time period.  By having the Company commit to purchase its own stock, the insiders could sell their stock at a profit without driving down the Company's stock price and ensure that proper volume existed in the markets to absorb the shares that they sold.

### 1.    The Board Approved Massive Buybacks in Violation of Their Fiduciary Duties

236. While the Board implemented and oversaw the Company's cannibalization of USPS revenues, and with knowledge that the business practice was unsustainable, between June 2016 and December 2018, the Board approved the repurchase of Company stock pursuant to a stock repurchase plan on six separate occasions.

- On February 22, 2016, The Board approved a new stock repurchase plan authorizing the Company to repurchase up to $20 million of common stock during the next six months.

- On July 27, 2016, the Board approved a new stock repurchase plan authorizing the Company to repurchase up to $40 million of common stock during the next six months.

- On October 25, 2016, the Board approved a new stock repurchase plan, which became effective November 7, 2016, authorizing the Company to repurchase up to $90 million of common stock during the next six months.

- On April 24, 2017, the Board approved a new stock repurchase plan, which took effect upon expiration of the plan in place on May 8, 2017, authorizing the Company to repurchase up to $90 million of common stock over the six months following the effective date of the plan.

- On October 24, 2017, the Board approved a new stock repurchase plan, which took effect upon expiration of the plan in place on November 10, 2017, authorizing the Company to repurchase up to $90 million of common stock over the six months following the effective date of the plan.

- On April 25, 2018, the Board approved a new stock repurchase plan, which took effect upon expiration of the plan in place on May 11, 2018, authorizing the Company to repurchase up to $90 million of common stock over the six months following the effective date of the plan.

- On October 24, 2018, the Board approved a new stock repurchase plan, which took effect upon expiration of the plan in place on November 11, 2018, authorizing the Company to repurchase up to $90 million of common stock over the six months following the effective date of the plan.

237. As a result of the Board's actions, since June 2016, the Company has repurchased a total of 2,812,848 shares of Stamps.com stock using a total of $383,268,406.21 in corporate funds at prices artificially inflated due to the reseller scheme, as demonstrated by the dramatic decline in the price of Stamps.com common stock once the true facts were disclosed.

| Month | Total Shares Repurchased | Average Price | Aggregate Purchase Price |
|---|---|---|---|
| March 2016 | 30,007 | $114.22 | $3,427.399,54 |
| April 2016 | 34,632 | $94.41 | $3,269,607.12 |
| May 2016 | 138,747 | $83.26 | $11.552,075.22 |
| June 2016 | 131,135 | $89.61 | $11,751,007.35 |
| August 2016 | 103,427 | $87.23 | $9,021,937.21 |
| September 2016 | 89,903 | $93.14 | $8,373,565.42 |
| October 2016 | 86,455 | $93.59 | $8,091,323.45 |
| November 2016 | 118,782 | $105.93 | $12,582,577.26 |
| December 2016 | 110,999 | $112.39 | $12,475,177.61 |
| January 2017 | 101,161 | $118.61 | $11,998,706.21 |
| February 2017 | 91,557 | $127.78 | $11,699,153.46 |
| March 2017 | 163,124 | $123.76 | $20,188,229.24 |
| April 2017 | 156,566 | $109.19 | $17,095,441.54 |
| May 2017 | 163,195 | $116.81 | $19,062,807.95 |
| June 2017 | 54,000 | $145.44 | $7,853,760.00 |
| July 2017 | 46,300 | $147.35 | $6,822,305.00 |
| August 2017 | 23,400 | $196.06 | $4,587,804.00 |
| September 2017 | 19,000 | $199.77 | $3,795,630.00 |
| October 2017 | 19,300 | $219.34 | $4,233,262.00 |
| November 2017 | 65,800 | $176.54 | $11,616,332.00 |
| December 2017 | 84,100 | $175.78 | $14,783,098.00 |
| January 2018 | 42,300 | $193.56 | $8,187,588.00 |
| February 2018 | 40,290 | $188.62 | $7,599,499.80 |
| March 2018 | 37,600 | $197.57 | $7,428,632.00 |
| April 2018 | 21,700 | $211.97 | $4,599,749.00 |
| May 2018 | 17,300 | $244.34 | $4,227,082.00 |
| June 2018 | 15,100 | $263.76 | $3,982,776.00 |
| July 2018 | 14,700 | $270.07 | $3,970,029.00 |
| August 2018 | 18,500 | $244.69 | $4,526,765.00 |
| September 2018 | 16,000 | $234.36 | $3,749,760.00 |

| Month | Total Shares Repurchased | Average Price | Aggregate Purchase Price |
|---|---|---|---|
| October 2018 | 73,761 | $202.41 | $14,929,964.01 |
| November 2018 | 223,619 | $163.18 | $36,490,148.42 |
| December 2018 | 233,927 | $158.70 | $37,124,214.90 |
| January 2019 | 151,604 | $164.45 | $24,931,277.80 |
| February 2019 | N/A | N/A | N/A |
| March 2019 | 83,857 | $84.18 | $7,059,082.26 |
| **Total** | **2,821,848** | | **$383,268.406.31** |

238.  At the time of these approvals, ███████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████.

239.  In July 2016 and October 2016, the Board approved stock repurchase plans while knowing that the Company's revenue growth was unsustainable given the abusive practices. Despite these warnings, the Board failed to adequately disclose the truth about the Company's reliance on abuse of the Reseller Program to generate revenue growth, which was unsustainable.

240.  Following the false statements made by McBride, with approval of the Board, in response to market commentator reports, the Board approved further repurchase plans, including on April 24, 2017.  The Board's timing coincided perfectly with the time period during which executives and directors would begin

selling hundreds of millions of dollars in stock on the open market.  It is reasonable

to infer that the Board's decision ███████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████.

241.   Then, on April 24, 2018, the Board approved another share repurchase

program.  However, this was done after the creation of the U.S. Government Task

Force  to  evaluate  USPS's  operations  and  finances,  ████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████.

242.   Finally, and perhaps most egregiously, the Board approved the final

share repurchase plan in October 2018.  The approval was done in bad faith and

was not a valid exercise of business judgment because ███████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████.  Yet, from November to January, Stamps.com

repurchased almost ***$100 million of its common stock – by far the largest dollar***

***amount  that  the  Company  repurchased  during  any  three-month  period  in  its***

***history.***

243.   Had the Board not repurchased an enormous number of shares while

in possession of material information regarding the deterioration of the Company's

business relationship with the USPS, the Company would have saved approximately ***$279,142.215***.

### 2. In Repurchasing Stock, Stamps.com Relied on the Section 10(b) Defendants' False or Misleading Statements

244.   In repurchasing shares in connection with the stock repurchase program, Stamps.com relied on the Section 10(b) Defendants' false or misleading statements, either directly or through the "fraud on the market" doctrine articulated in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014), or through the doctrine articulated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

245.   Throughout the Relevant Period, Stamps.com, justifiably expected the Section 10(b) Defendants to disclose material information as required by law and SEC regulations in the Company's periodic filings with the SEC.  Stamps.com would not have repurchased its securities at artificially inflated prices had the Section 10(b) Defendants disclosed all material information then known to them, as detailed in this Complaint.  Thus, reliance by Stamps.com should be presumed with respect to the omissions of material information as established under the *Affiliated Ute* presumption of reliance.

246.   Additionally, the "fraud on the market" presumption applies to Defendants' misstatements of material fact or failures to disclose material facts.

247. At all relevant times, the market for Stamps.com's common stock was efficient, for the following reasons, among others:

a. Stamps.com's common stock was listed and actively traded on NASDAQ, an informationally efficient market, throughout the Relevant Period.

b. As a regulated issuer, Stamps.com filed periodic public reports with the SEC and the NASDAQ;

c. Stamps.com's common-stock trading volume was substantial on a daily basis, exceeding an average volume of hundreds of thousands of shares during the Relevant Period;

d. Stamps.com regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

e. The market of Stamps.com's common stock reacted promptly to new information entering the market; and

f. Stamps.com's securities were covered by multiple securities analysts who wrote reports that were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public marketplace.

248.   As a result of the foregoing, the market for Stamps.com common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Stamps.com's stock.  The foregoing facts indicate the existence of an efficient market for trading of Stamps.com common stock and support application of the fraud-on-the-market doctrine.

249.   Stamps.com relied on the integrity of the market price for the repurchase of its stock and is entitled to a presumption of reliance with respect to the Section 10(b) Defendants' misstatements and omissions alleged in this Complaint.

250.   Had Stamps.com known of the material adverse information not disclosed by the Section 10(b) Defendants or been aware of the truth behind the material misstatements, the Company would not have repurchased Stamps.com common stock at artificially inflated prices.

### 3.     Neither the Statutory "Safe Harbor" Nor the "Bespeaks Caution" Doctrine Applies to the Section 10(b) Defendants' Misrepresentations

251.   The Section 10(b) Defendants acted with scienter because at the time that they issued public documents and other statements in Stamps.com's name they knew, or with extreme recklessness disregarded, the fact that such statements were materially false and misleading or omitted material facts.  Moreover, the Section

10(b) Defendants knew such documents and statements would be issued or disseminated to the investing public, knew that persons were likely to rely upon those misrepresentations and omissions, and knowingly and recklessly participated in the issuance and dissemination of such statements and documents as primary violators of the federal securities laws.

252.   Neither the safe-harbor provision of the Private Securities Litigation Reform Act of 1995 ("PSLRA") nor the judicially created "bespeaks caution" doctrine applicable to forward-looking statements under certain circumstances applies to any of the false or misleading statements pleaded in this Complaint. None of the subject statements constituted a forward-looking statement; rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about Stamps.com's financial success and its reseller initiatives, among other things.

253.   Alternatively, to the extent any of the false or misleading statements pleaded in this Complaint could be construed as forward-looking statements, they were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.   Further, to the extent the PSLRA's safe harbor would otherwise apply to any forward-looking statements pleaded in this Complaint, Defendants are liable for those false or misleading statements because

at the time each of those statements was made, the speaker(s) knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of Stamps.com or a Section 10(b) Defendant who knew the statement was materially false or misleading when made.

### 4.      The Section 10(b) Defendants' Misstatements and Omissions Caused Damages to Stamps.com

254.   Throughout the Relevant Period, the price of Stamps.com's common stock was artificially inflated as a result of the Section 10(b) Defendants' materially false and misleading statements and omissions identified above.   The Section 10(b) Defendants engaged in a scheme to deceive the market and a course of conduct that operated as a fraud or deceit on Stamps.com, which repurchased shares at artificially inflated prices.   When the Section 10(b) Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Stamps.com stock fell as the prior artificial inflation dissipated.   As a result of its purchases of Stamps.com shares during the Relevant Period, the Company suffered damages under the federal securities laws.

255.   On February 21, 2019, two months after the Task Force Report was released, Stamps.com stunned investors by announcing the end of its exclusive USPS partnership.   On a subsequent earnings call to discuss Stamps.com's fourth quarter and year-end 2018 financial results, McBride misleadingly represented that it was the Company that had "decided to discontinue [its] shipping partnership

with the USPS so that [it could] fully embrace partnerships with other carriers who

. . . will be well positioned to win in the shipping business in the next 5 years."

This revelation confused the market, which attempted to process the inexplicable

announcement that Stamps.com was simply walking away from a business

relationship that accounted for a significant portion of its revenue.  As a result of

this news, the Company's stock price dropped by $114 per share on record trading

volume of 13.7 million shares, from $198 per share to close at less than $84 per

share on February 22, 2019, a decline of over 57%.  On May 8, 2019, Stamps.com

again shocked investors, slashing the Company's FY19 profit outlook.

Stamps.com announced that it was lowering earnings guidance because of potential

unfavorable short- and long-term amendments, renegotiations, and termination of

certain NSAs between the USPS and the Company's reseller partners – ████

████████████████████████████████████████████████████

despite falsely asserting that they "very recently bec[a]me aware" of these adverse

conditions that would have a negative impact on Stamps.com's financial

statements.  The Company further stated that it now expected FY19 profit of $3.35

to $4.85 per share, down from its prior estimate of $5.15 to $6.15 per share.  As a

result of this news, Stamps.com' stock price dropped another $46 per share, on

record trading volume of 16.8 million shares, to close at $36,90 per share on May

9, 2019, a decline of over *56%*.  The two consecutive 50% slides in Stamps.com's

share price following two consecutive quarterly announcements is extraordinary, and they took place in only two and a half months as the truth regarding Stamps.com's deteriorating relationship with the USPS reached the market. Overall, the Section 10(b) Defendants caused Stamps.com to overpay for its common stock repurchases by $279,142.215.

**5.    Insiders Dumped Hundreds of Millions of Dollars of Company Stock at Opportune Times, Avoiding Over a Hundred Million Dollars in Losses**

256.   Perhaps most importantly, the Board decided to approve, renew, and escalate the Company's share repurchases at the exact time (and continuously thereafter) that the Company's insiders started to sell off massive amounts of stock, ultimately totaling approximately $190 million in insider sales. Each of the following Defendants engaged in insider trading while in the possession of material inside information as detailed above concerning Stamps.com's reseller business model that jeopardized its business relations with the USPS and should be required to disgorge their profits.

257.   The insider sales were suspicious in timing.  The sales were also made at times when the stock was trading at over $200 per share and senior management and the Board were materially inflating the Company's revenues through their reseller scheme.  The suspiciousness of the insider stock sales and their proximity to the Company's concurrent stock repurchases raise a strong inference that these

insiders were aware of the unsustainability of Stamps.com's reseller scheme when they sold their shares and used that information in connection with the sales to avoid the significant losses in share value that would follow from the impending collapse of Stamps.com's key source of revenue and profits.

### i.    Defendant Ananda

258.   Defendant Ananda made the following trades during the events described above even though, prior to June 16, 2017, Ananda had not sold any of his Stamps.com stock.

| Trade Date | Shares Sold | Av. Price | Total Proceeds |
|---|---|---|---|
| June 16, 2017 | 15,200 | $142.10 | $2,159,920 |
| June 16, 2017 | 3,914 | $144.4464 | $565,363.21 |
| June 16, 2017 | 9,890 | $145.3112 | $1,437,127.77 |
| June 16, 2017 | 4,410 | $146.3268 | $645,301.19 |
| June 16, 2017 | 6,586 | $147.0841 | $968,695.88 |
| August 11, 2017 | 19,358 | $207.2965 | $4,012,845.65 |
| August 11, 2017 | 6,073 | $208.2036 | $1,264,420.46 |
| August 11, 2017 | 2,694 | $209.4694 | $564,310.56 |
| August 11, 2017 | 1,875 | $210.45 | $394,593.75 |
| August 14, 2017 | 3,948 | $211.1034 | $833,436.22 |
| August 14, 2017 | 4,639 | $211.7088 | $982,117.12 |
| August 14, 2017 | 1,275 | $212.6714 | $271,156.04 |
| August 14, 2017 | 138 | $213.4928 | $29,462.01 |
| February 26, 2018 | 1,000 | $203.18 | $203,180.00 |
| June 12, 2018 | 20,000 | $270.0003 | $5,400,006.00 |
| March 6, 2019 | 1,000 | $93.3223 | $93,322.30 |
| **Totals** | **102,000** | | **$19,525,258.16** |

## ii.     Defendant Jones

259.   Defendant Jones made the following trades during that time, which were nearly 30% of his stock holdings.

| Trade Date | Shares Sold | Av. Price | Total Proceeds |
|---|---|---|---|
| August 7, 2017 | 2,800 | $204.6687 | $573,072.36 |
| August 7, 2017 | 6,880 | $205.3978 | $1,413,136.86 |
| August 7, 2017 | 3,820 | $206.4837 | $788,767.73 |
| August 7, 2017 | 6,500 | $207.4488 | $1,348,417.20 |
| August 7, 2017 | 7,000 | $216.0264 | $1,512,184.80 |
| June 1, 2018 | 4,700 | $260.2431 | $1,223,142.57 |
| June 1, 2018 | 5,300 | $261.4118 | $1,385,482.54 |
| **Totals** | **37,000** | | **$8,244,204.06** |

## iii.     Defendant McBride

260.   Defendant McBride made the following trades during the events described above. Although Defendant McBride had executed some trades prior to January 2014, he did not execute any further trades until March 2017.

| Trade Date | Shares Sold | Av. Price | Total Proceeds |
|---|---|---|---|
| March 8, 2017 | 23,830 | $127.1873 | $3,030,873.36 |
| March 8, 2017 | 6,170 | $127.7576 | $788,264.39 |
| March 10, 2017 | 4,000 | $129.4431 | $517,772.40 |
| March 10, 2017 | 10,420 | $129.9538 | $1,354,118.60 |
| March 10, 2017 | 25,580 | $130.4757 | $3,337,568.41 |
| March 16, 2017 | 1,800 | $131.2639 | $236,275.02 |
| March 16, 2017 | 2,573 | $131.8413 | $339,227.67 |
| March 16, 2017 | 627 | $132.8829 | $83,317.58 |
| April 17, 2017 | 1,477 | $105.0505 | $155,159.59 |
| April 17, 2017 | 6,752 | $106.2162 | $717,171.78 |

| Trade Date | Shares Sold | Av. Price | Total Proceeds |
|---|---|---|---|
| April 17, 2017 | 1,771 | $106.7378 | $189,032.64 |
| November 27, 2017 | 141,733 | $180.0145 | $25,513,995.13 |
| November 28, 2017 | 400 | $180.5938 | $72,237.52 |
| December 18, 2017 | 400 | $180.00 | $72,000.00 |
| December 18, 2017 | 2,088 | $181.542 | $379,059.70 |
| December 18, 2017 | 3,012 | $182.4778 | $549,623.13 |
| December 18, 2017 | 2,443 | $183.5184 | $448,335.45 |
| December 18, 2017 | 172 | $184.10 | $31,665.20 |
| March 2, 2018 | 6,362 | $200.0143 | $1,272,490.98 |
| March 7, 2018 | 9,254 | $200.1382 | $1,852,078.90 |
| March 7, 2018 | 127 | $201.35 | $25,571.45 |
| March 7, 2018 | 100 | $201.45 | $20,145.00 |
| March 8, 2018 | 4,528 | $200.2158 | $906,577.14 |
| March 8, 2018 | 5,500 | $201.6355 | $1,108,995.25 |
| March 8, 2018 | 409 | $202.2711 | $82,728.88 |
| March 9, 2018 | 700 | $200.2107 | $140,147.49 |
| March 9, 2018 | 5,236 | $203.1255 | $1,063,565.12 |
| March 9, 2018 | 2,603 | $204.1012 | $531,275.42 |
| March 9, 2018 | 2,704 | $205.1823 | $554,812.94 |
| March 9, 2018 | 2,814 | $205.9923 | $579,662.33 |
| **Totals** | **275,585** | | **$45,953,748.00** |

### iv.    Defendant Huebner

261.   Defendant Huebner made the following trades during the events described above.  From January 2014 until January 2017, Huebner did not sell any of his Company stock.

| Trade Date | Shares Sold | Av. Price | Total Proceeds |
|---|---|---|---|
| February 16, 2017 | 3,000 | $130.6558 | $391,967.40 |
| February 16, 2017 | 7,000 | $130.7616 | $915,331.20 |

| Trade Date | Shares Sold | Av. Price | Total Proceeds |
|---|---|---|---|
| March 14, 2017 | 17,966 | $128.3513 | $2,305,959.46 |
| March 14, 2017 | 16,363 | $129.5699 | $2,120,152.27 |
| March 14, 2017 | 10,871 | $130.3405 | $1,416,931.58 |
| March 15, 2017 | 2,933 | $129.6204 | $380,176.63 |
| March 15, 2017 | 6,536 | $130.6754 | $854,094.41 |
| March 15, 2017 | 17,234 | $131.4367 | $2,265,180.09 |
| March 15, 2017 | 12,013 | $132.285 | $1,589,139.71 |
| March 15, 2017 | 11,284 | $133.2255 | $1,503,316.54 |
| March 16, 2017 | 15,752 | $131.1975 | $2,066,623.02 |
| March 16, 2017 | 24,068 | $131.8637 | $3,173,695.53 |
| March 16, 2017 | 5,634 | $132.9359 | $748,960.86 |
| March 5, 2018 | 3,386 | $193.3737 | $654,763.35 |
| March 5, 2018 | 18,359 | $194.2758 | $3,566,709.41 |
| March 5, 2018 | 5,567 | $195.3189 | $1,087,340.32 |
| March 5, 2018 | 7,469 | $196.2418 | $1,465,730.00 |
| March 5, 2018 | 1,820 | $197.3753 | $359,223.05 |
| March 5, 2018 | 1,000 | $198.425 | $198,425.00 |
| March 7, 2018 | 5,661 | $200.1236 | $1,132,899.70 |
| March 8, 2018 | 2,408 | $200.1431 | $481,944.58 |
| March 8, 2018 | 2,200 | $201.5864 | $443,490.08 |
| March 8, 2018 | 200 | $202.45 | $40,490.00 |
| March 9, 2018 | 700 | $200.3321 | $140,232.47 |
| March 9, 2018 | 200 | $202.80 | $40,560.00 |
| March 9, 2018 | 1,313 | $203.3533 | $267,002.88 |
| March 9, 2018 | 800 | $204.4688 | $163,575.04 |
| March 9, 2018 | 1,100 | $205.7727 | $226,349.97 |
| **Totals** | **202,837** | | **$30,000,264.55** |

### v.     Defendant Clem

262.  Defendant Clem made the following trades during the events described above.

| Trade Date | Shares Sold | Av. Price | Total Proceeds |
|---|---|---|---|
| March 16, 2017 | 709 | $130.7091 | $92,672.75 |
| March 16, 2017 | 6,301 | $131.5924 | $829,163.71 |
| March 16, 2017 | 2,402 | $132.7376 | $318,835.72 |
| June 7, 2017 | 6,170 | $144.00 | $888,480.00 |
| September 20, 2017 | 2,500 | $210.037 | $525,092.50 |
| September 21, 2017 | 3,200 | $210.001 | $672,003.20 |
| September 22, 2017 | 3,020 | $210.0998 | $634,501.40 |
| September 22, 2017 | 1,280 | $211.1445 | $270,264.96 |
| October 3, 2017 | 500 | $220.00 | $110,000.00 |
| October 4, 2017 | 300 | $220.00 | $66,000.00 |
| October 11, 2017 | 3,037 | $220.2673 | $668,951.79 |
| October 11, 2017 | 435 | $221.2184 | $96,230.00 |
| October 12, 2017 | 1,300 | $220.2885 | $286,375.05 |
| October 12, 2017 | 600 | $221.575 | $132,945.00 |
| October 12, 2017 | 2,582 | $222.7654 | $575,180.26 |
| October 12, 2017 | 1,246 | $223.6555 | $278,674.75 |
| October 24, 2017 | 8,410 | $230.2049 | $1,936,023.21 |
| October 24, 2017 | 1,590 | $230.0196 | $365,731.16 |
| May 4, 2018 | 200 | $240.20 | $48,040.00 |
| May 7, 2018 | 8,590 | $240.2266 | $2,063,546.49 |
| May 7, 2018 | 900 | $241.6389 | $217,475.01 |
| May 7, 2018 | 310 | $242.3306 | $75,122.49 |
| May 14, 2018 | 3,500 | $250.2036 | $875,712.60 |
| May 14, 2018 | 200 | $251.10 | $50,220.00 |
| May 21, 2018 | 2,200 | $250.142 | $550,312.40 |
| May 29, 2018 | 3,899 | $250.1452 | $975,316.14 |
| May 29, 2018 | 150 | $251.2433 | $37,686.50 |

| Trade Date | Shares Sold | Av. Price | Total Proceeds |
|---|---|---|---|
| May 30, 2018 | 51 | $250.90 | $12,795.90 |
| June 1, 2018 | 6,014 | $260.0777 | $1,564,107.29 |
| June 1, 2018 | 200 | $261.20 | $52,240.00 |
| June 4, 2018 | 1,320 | $260.0038 | $343,205.02 |
| June 5, 2018 | 588 | $260.4201 | $153,127.02 |
| June 5, 2018 | 428 | $261.8964 | $112,091.66 |
| June 6, 2018 | 343 | $260.8025 | $89,455.26 |
| June 6, 2018 | 841 | $261.7818 | $220,158.49 |
| June 6, 2018 | 266 | $262.5859 | $69,847.85 |
| June 12, 2018 | 4,513 | $270.0801 | $1,218,871.49 |
| June 12, 2018 | 1,885 | $271.7005 | $512,155.44 |
| June 12, 2018 | 3,602 | $272.2687 | $980,711.86 |
| June 14, 2018 | 1,400 | $280.0071 | $392,009.94 |
| June 14, 2018 | 2,230 | $281.7081 | $628,209.06 |
| June 14, 2018 | 200 | $282.60 | $56,520.00 |
| **Totals** | **89,412** | | **$19,249,063.37** |

### vi.   Defendant Buerba

263. Defendant Buerba made the following trades during the events described above. Defendant Buerba sold nearly all his stock during this period, opting to retain only 164 shares as of October 1, 2018.

| Trade Date | Shares Sold | Av. Price | Total Proceeds |
|---|---|---|---|
| September 11, 2017 | 10,843 | $190.2626 | $2,063,017.37 |
| September 11, 2017 | 4,638 | $191.1791 | $886,688.67 |
| September 11, 2017 | 17,143 | $192.5407 | $3,300,725.22 |
| March 8, 2018 | 1,900 | $200.7526 | $381,429.94 |
| March 8, 2018 | 3,795 | $201.6785 | $765,369.91 |
| March 9, 2018 | 500 | $200.23 | $100,115.00 |
| March 9, 2018 | 100 | $201.45 | $20,145.00 |

| Trade Date | Shares Sold | Av. Price | Total Proceeds |
|---|---|---|---|
| March 9, 2018 | 3,637 | $203.1265 | $738,771.08 |
| March 9, 2018 | 1,800 | $204.1389 | $367,450.02 |
| March 9, 2018 | 2,401 | $205.4022 | $493,170.68 |
| March 9, 2018 | 1,185 | $206.0825 | $244,207.76 |
| June 11, 2018 | 1,619 | $265.1659 | $429,303.59 |
| June 11, 2018 | 3,675 | $265.9412 | $977,333.91 |
| June 11, 2018 | 9,684 | $267.0054 | $2,585,680.29 |
| June 11, 2018 | 2,799 | $267.9445 | $749,976.66 |
| June 12, 2018 | 662 | $267.8051 | $177,286.98 |
| June 12, 2018 | 400 | $269.3125 | $107,725.00 |
| June 12, 2018 | 200 | $270.40 | $54,080.00 |
| June 12, 2018 | 500 | $271.70 | $135,850.00 |
| June 12, 2018 | 738 | $272.2458 | $200,917.40 |
| July 2, 2018 | 200 | $247.65 | $49,530.00 |
| July 2, 2018 | 100 | $249.40 | $24,940.00 |
| July 2, 2018 | 500 | $250.94 | $125,470.00 |
| July 2, 2018 | 528 | $251.9304 | $133,019.25 |
| July 2, 2018 | 211 | $253.5078 | $53,490.15 |
| July 2, 2018 | 531 | $255.1688 | $135,494.63 |
| July 2, 2018 | 429 | $255.9804 | $109,815.59 |
| August 1, 2018 | 100 | $257.25 | $25,725.00 |
| August 1, 2018 | 1,001 | $258.7296 | $258,988.33 |
| August 1, 2018 | 550 | $259.6227 | $142,792.49 |
| August 1, 2018 | 850 | $261.3353 | $222,135.01 |
| September 4, 2018 | 400 | $246.794 | $98,717.60 |
| September 4, 2018 | 730 | $247.889 | $180,958.97 |
| September 4, 2018 | 383 | $248.8273 | $95,300.86 |
| September 4, 2018 | 50 | $249.85 | $12,492.50 |
| September 4, 2018 | 150 | $251.2667 | $37,690.01 |
| September 4, 2018 | 650 | $252.9362 | $164,408.53 |
| September 4, 2018 | 136 | $253.4023 | $34,462.71 |

| Trade Date | Shares Sold | Av. Price | Total Proceeds |
|---|---|---|---|
| October 1, 2018 | 251 | $219.3625 | $55,059.99 |
| October 1, 2018 | 500 | $220.3791 | $110,189.55 |
| October 1, 2018 | 400 | $221.5213 | $88,608.52 |
| October 1, 2018 | 350 | $222.4767 | $77,866.85 |
| October 1, 2018 | 450 | $223.6811 | $100,656.50 |
| October 1, 2018 | 250 | $225.026 | $56,256.50 |
| October 1, 2018 | 300 | $225.9917 | $67,797.51 |
| **Totals** | **169,484** | | **$35,648,442.50** |

### vii.   Defendant Carberry

264.   Defendant Carberry made the following trades during the events described above.  These are the only to trades that he made during his tenure in the Company.  They represented more than 86% of his stock holdings in October 2017.

| Trade Date | Shares Sold | Av. Price | Total Proceeds |
|---|---|---|---|
| October 23, 2017 | 7,346 | $225.00 | $1,652,850.00 |
| October 24, 2017 | 52,237 | $225.017 | $11,754,213.03 |
| **Totals** | **59,583** | | **$13,407,063.03** |

### viii.   Defendant Lipson

265.   Defendant Lipson made the following trades during the events described above.  As a result of the trades listed above, Defendant Lipson sold all but 650 shares of Company stock he beneficially owned.

| Trade Date | Shares Sold | Av. Price | Total Proceeds |
|---|---|---|---|
| January 16, 2018 | 700 | $185.70 | $129,990.00 |
| January 16, 2018 | 2,130 | $187.13 | $398,586.90 |

| Trade Date | Shares Sold | Av. Price | Total Proceeds |
|:---:|:---:|:---:|:---:|
| January 16, 2018 | 2,302 | $187.9804 | $432,730.88 |
| January 16, 2018 | 1,359 | $189.1107 | $257,001.44 |
| January 16, 2018 | 2,435 | $190.2413 | $463,237.57 |
| January 16, 2018 | 1,000 | $191.185 | $191,185.00 |
| January 16, 2018 | 1,000 | $192.515 | $192,515.00 |
| January 16, 2018 | 400 | $192.9875 | $77,195.00 |
| January 16, 2018 | 500 | $194.76 | $97,380.00 |
| February 15, 2018 | 1,500 | $185.21 | $277,815.00 |
| February 15, 2018 | 1,963 | $186.5298 | $366,158.00 |
| February 15, 2018 | 3,902 | $187.3893 | $731,193.05 |
| February 15, 2018 | 1,000 | $188.575 | $188,575.00 |
| February 15, 2018 | 1,500 | $189.5333 | $284,299.95 |
| February 15, 2018 | 135 | $190.3259 | $25,694.00 |
| March 15, 2018 | 3,434 | $197.8178 | $679,306.33 |
| March 15, 2018 | 1,116 | $198.7447 | $221,799.09 |
| March 15, 2018 | 2,800 | $199.9268 | $559,795.04 |
| March 15, 2018 | 2,014 | $200.8825 | $404,577.36 |
| March 15, 2018 | 536 | $201.6179 | $108,067.19 |
| April 16, 2018 | 1,320 | $201.7614 | $266,325.05 |
| April 16, 2018 | 2,737 | $202.869 | $555,252.45 |
| April 16, 2018 | 500 | $203.86 | $101,930.00 |
| April 16, 2018 | 1,317 | $205.2235 | $270,279.35 |
| April 16, 2018 | 1,600 | $205.9344 | $329,495.04 |
| April 16, 2018 | 1,200 | $206.925 | $248,310.00 |
| April 16, 2018 | 500 | $207.74 | $103.870.00 |
| May 15, 2018 | 1,281 | $243.80 | $542,887.80 |
| **Totals** | **42,181** | | **$8,505.451,49** |

### ix.     Defendant Khechfe

266.  Defendant Khechfe made the following trades during the events described above.

| Trade Date | Shares Sold | Av. Price | Total Proceeds |
|---|---|---|---|
| May 4, 2017 | 2,400 | $120.00 | $288,000.00 |
| June 1, 2017 | 1,200 | $137.85 | $165,420.00 |
| July 3, 2017 | 1,200 | $155.15 | $186,180.00 |
| August 1, 2017 | 1,200 | $149.05 | $178,860.00 |
| September 1, 2017 | 1,200 | $191.25 | $229,500.00 |
| October 2, 2017 | 1,200 | $202.90 | $243,480.00 |
| November 1, 2017 | 1,200 | $226.65 | $271,980.00 |
| December 1, 2017 | 1,200 | $167.40 | $200,880.00 |
| January 2, 2018 | 1,200 | $188.25 | $225,900.00 |
| February 1, 2018 | 1,200 | $202.05 | $242,460.00 |
| March 1, 2018 | 1,200 | $191.35 | $229,620.00 |
| April 2, 2018 | 1,200 | $199.55 | $239,460.00 |
| May 1, 2018 | 1,200 | $226.00 | $271,200.00 |
| June 1, 2018 | 6,200 | $253.00 | $1,568,600.00 |
| July 2, 2018 | 1,200 | $249.35 | $299,220.00 |
| August 1, 2018 | 1,200 | $262.80 | $315,360.00 |
| September 4, 2018 | 1,200 | $248.15 | $297,780.00 |
| October 1, 2018 | 1,200 | $226.66 | $271,992.00 |
| November 1, 2018 | 1,200 | $186.24 | $223,488.00 |
| January 2, 2019 | 1,200 | $152.45 | $182,940.00 |
| February 1, 2019 | 1,200 | $185.15 | $222,180.00 |
| February 15, 2019 | 11,100 | $200.00 | $2,220,000.00 |
| February 15, 2019 | 100 | $200.07 | $20,007.00 |
| **Totals** | **42,600** | | **$8,594,507.00** |

267.   All told, by trading on material, nonpublic information, Defendants Ananda, Jones, McBride, Huebner, Clem, Buerba, Carberry, Lipson, and Khechfe avoided losses totaling ***$150,347,128.81***.   A summary of the losses avoided for each director and officer who traded is provided below:

- Ananda avoided a total of $16,005,039.16 in losses.

- Jones avoided a total of $6,878,904.07 in losses.

- McBride avoided a total of $35,784,678.43 in losses.

- Huebner avoided a total of $22,515,579.25 in losses.

- Clem avoided a total of $16,746,760.56 in losses.

- Buerba avoided a total of $29,477,446.16 in losses.

- Carberry avoided a total of $11,208,450.33 in losses.

- Lipson avoided a total of $6,718,392.57 in losses.

- Khechfe avoided a total of $7,022,567 in losses.

## V.   FIDUCIARY DUTIES

### A.   Duties of the Individual Defendants

268.   By reason of their positions as officers, directors, and/or fiduciaries of Stamps.com and because of their ability to control the business and corporate affairs of the Company, the Officer and Director Defendants owed and continue to owe Stamps.com and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Stamps.com in a fair, just, honest, and equitable manner.   The Officer

and Director Defendants were and are required to act in furtherance of the best interests of Stamps.com and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit.

269.   To discharge their duties, the Officer and Director Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the Officer and Director Defendants were required to, among other things:

- to conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

- to remain informed as to how Stamps.com conducted its operations, and upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices as necessary to comply with applicable laws; and

- to ensure the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## B.     Duties of the Board of Directors

270.   According to the Company's 2018 Proxy Statement:[55]

all members of our Board take an active role in evaluating our risks
and strategic direction.  Each committee of our Board is responsible
for evaluating certain risks and overseeing the management of such
risks.  The Compensation Committee is responsible for overseeing the
management of risks relating to our executive compensation plans and
arrangements.  The Audit Committee oversees the process by which
our senior management and the relevant departments assess and
manage our exposure to, and management of, financial risks as well as
potential conflicts of interest…

Our entire Board is regularly informed about these risks and oversees
the management of these risks and regularly reviews information
regarding our operations and finances as well as our strategic
direction.  Our Board's role in risk oversight has confirmed our
Board's determination that its leadership structure is most appropriate
for our company, as the Board is fully integrated into the risk
oversight function.

271.   Additionally, the 2018 Proxy Statement notes that ". . . the Board is
fully integrated into the risk oversight function."

## C.     Duties Arising from Stamps.com's Code of Business and Ethical Conduct

272.   Stamps.com's Code of Business and Ethical Conduct ("Code of
Conduct") "embodies rules regarding individual and peer responsibilities, as well

---

[55] Stamps.com, Proxy Statement (Schedule 14A), at 8 (April 30, 2018) ("2018 Proxy").

144

as responsibilities to Stamps.com, the public and other stakeholders." [56]   The Code

of Conduct sets forth the following "principles to which [the Company's] officers,

directors and employees are expected to adhere and advocate:"

- Section 1 of the Code of Conduct declares that officers, directors, and employees "must always promote honest and ethical conduct;"

- Section 4 of the Code of Conduct asserts that officers, directors, and employees must "comply with applicable rules and regulations of federal, state, provincial, local and foreign governments, and other appropriate private and public regulatory agencies;"

- Section 5 of the Code of Conduct states that officers, directors, and employees "must act in good faith, responsibly, [and] with due care, competence and diligence;"

- Section 7 of the Code of Conduct notes that officers, directors, and employees "should proactively promote ethical behavior as a responsible partner among peers in their work environment and community;" and

- Section 8 of the Code of Conduct declares that officers, directors, and employees "must responsibly use and control all assets and resources employed or entrusted to them." [57]

### D.   Duties of the Audit Committee

273.   The Company's Audit Committee Charter asserts that the "primary

function" of the Audit Committee is to "assist the Board of Directors in fulfilling

---

[56] *Stamps.com Code of Business and Ethical Conduct*, available at https://investor.stamps.com/corporate-governance/governance-documents   (last visited September 6, 2019).
[57] *Id.*

its oversight responsibilities by reviewing the financial information which will be provided to the shareholders and others, the systems of internal controls which management and the Board of Directors have established, and the Corporation's audit and financial reporting process."

274.  The Audit Committee therefore reports on "exposure to, and management of, financial risks" to the Board of Directors.  The Audit Committee is responsible for risk oversight duties of the Company.

275.  The Audit Committee is given the following responsibilities and duties:[58]

A.  Review [the Company's] Charter at least annually and recommend any changes to the Board of Directors.

B.  Review [the Company's] annual financial statements and any other relevant reports or other financial information.

C.  Review the regular internal financial reports prepared by management.

D.  Select the independent accountants and approve the fees and other compensation to be paid to the independent accountants.

E.  Pre-approve all audit and permitted non-audit services to be performed by the independent accountants.

F.  Review and ensure the independence of the independent accountants.  This review shall cover and include services, fees,

---

[58] *See* Stamps.com Inc. Audit Committee Charter, available at https://investor.stamps.com/corporate-governance/governance-documents (last visited September 6, 2019).

quality control procedures and a formal written statement from the independent auditors regarding relationships between the independent auditors and the Corporation, consistent with Independence Standard Board Standard No. 1.

G.    Review the performance of the independent accountants and discharge the independent accountants if and when circumstances warrant.

H.    Following completion of the annual audit, review separately with the independent accountants and management any problems or difficulties encountered during the course of the audit.

I.    Establish procedures for the receipt, retention, and treatment of complaints received by the [Company] regarding accounting internal accounting controls, or auditing matters.

J.    Establish procedures for the confidential, anonymous submission by employees of the [Company] of concerns regarding questionable accounting or auditing matters.

K.    Perform any other activities consistent with this Charter, the [Company's] Bylaws and governing law, as the Audit Committee or the Board deems necessary or appropriate.

## VI.    BREACHES OF FIDUCIARY DUTIES

276.    The Officer and Director Defendants, because of their positions of control and authority as directors and/or officers of Stamps.com, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

277.    At all times relevant hereto, each of the Officer and Director Defendants was the agent of each of the other Officer and Director Defendants and of Stamps.com and was at all times acting within the course and scope of such agency.

278.   Each Officer and Director Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its stockholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Officer and Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Stamps.com, an absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders, which the Officer and Director Defendants were aware or should have been aware posed a risk of serious injury to the Company.

279.   The Officer and Director Defendants breached their duty of loyalty and good faith by allowing to cause, or by themselves causing, the Company to engage in the misconduct detailed herein.  In addition, as a result of the Officer and Director Defendants' course of conduct, the Company is now the subject of securities class action lawsuits.  As a result, Stamps.com has expended, and will continue to expend, significant sums of money.

## VII.   DERIVATIVE ALLEGATIONS

280.   Plaintiff brings this action derivatively in the right and for the benefit of Stamps.com to redress injuries suffered, and to be suffered, by Stamps.com as a direct result of violations of the breach of fiduciary duties and unjust enrichment,

as well as the aiding and abetting thereof, by the Officer and Director Defendants. Stamps.com is named as a nominal Defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

281.   Plaintiff will adequately and fairly represent the interests of Stamps.com in enforcing and prosecuting its rights.

282.   Plaintiff was a stockholder of Stamps.com at the time of the wrongdoing complained of, has continuously been a stockholder, and is a current Stamps.com stockholder.

## VIII.   DEMAND FUTILITY ALLEGATIONS

283.   Plaintiff did not make a demand on the Board to institute this action because pre-suit demand is excused. The facts alleged in the preceding paragraphs raise a reasonable doubt that, at a minimum, a majority of the current Board was disinterested and independent, or whether the approval of the Company's business plan and stock repurchases was a product of a valid exercise of business judgment.

284.   Demand is excused because Plaintiff raises a reasonable doubt that at least half of the Board at the time of the filing of this Complaint could not properly exercise independent and disinterested judgment in responding to a demand. The Board has six members: Defendants Ananda, Jones, McBride, Samuels, Habiger,

and May.  Each of these directors is either interested or lacks independence, and therefore is unable to make an impartial decision concerning a litigation demand.

285.  Defendants McBride, Jones, and Ananda in bad faith approved the Company's abusive and unsustainable business plan.  In advancing this unsustainable business plan, Defendants Ananda, Jones, and McBride in bad faith approved numerous acquisitions, including ShipStation, ShipWorks, Endicia, and ShippingEasy.

286.  Defendants McBride, Jones, Ananda, Samuels, and Habiger in bad faith maintained and expanded the Company's abusive business practices despite repeated warnings that those practices were cannibalizing USPS revenues and leading to USPS complaints, investigations, and (ultimately) cancellation of the Company's most lucrative business contract with the USPS.

287.  Defendants McBride, Jones, Ananda, Samuels, Habiger, and May in bad faith oversaw and allowed the Company (namely, McBride) to make numerous false statements about Stamps.com's business practices and its agreement with the USPS to both investors and the USPS, which resulted in the Company's stock price trading at an artificially inflated value.  At the same time, these Defendants approved an expansion of the Company's share repurchase program and failed to stop the Company's repurchases despite having knowledge of material, nonpublic

information and while knowingly and consciously failing to disclose the truth to the market.

288.   Moreover, while the Company's stock price traded at inflated levels, Defendants McBride, Jones, and Ananda disloyally engaged in insider selling, reaping millions of dollars in personal profit while possession of material, nonpublic information.

289.   Finally, Defendant May is incapable of assessing a demand because she is not independent of the Company.   Director May is an executive of ShippingEasy – one of the acquired companies engaged in abuse of the Reseller Program.   She currently reports to Defendant McBride. Because her livelihood depends on her executive position at the Company and remaining in McBride's good graces, she cannot objectively assess whether to bring claims against her superiors at Stamps.com.

## IX.   CLAIMS FOR RELIEF

**COUNT I**
**Derivatively Against Defendants McBride, Huebner,**
**Carberry, Ananda, Habiger, Jones and Samuels**
**for Violations of Section 10(b) Of the Exchange Act**
**and Rule 10b-5 Promulgated Thereunder**

290.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

291.   This Count is asserted on behalf of the Company against Defendants McBride, Huebner, Carberry, Ananda, Habiger, Jones and Samuels (the "Section 10(b) Defendants") for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

292.   During the Relevant Period, in connection with Stamps.com's repurchases of its shares, the Section 10(b) Defendants made, disseminated, or approved false or misleading statements about the Company as specified above in Section IV.D., which they knew or recklessly disregarded contained material misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  Those false or misleading statements and the Section 10(b) Defendants' course of conduct were designed to artificially inflate the price of the Company's common stock.

293.   At the same time that the price of Stamps.com's common stock was inflated due to the false and misleading statements made by the Section 10(b) Defendants, the Section 10(b) Defendants, caused the Company to repurchase millions of shares of its own stock at prices that were artificially inflated due to their false or misleading statements.  The Section 10(b) Defendants engaged in a scheme to defraud Stamps.com by causing the Company to purchase more than $383 million of Stamps.com common stock at artificially inflated prices.

294.   The Section 10(b) Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the Company in connection with the Company's purchases of Stamps.com common stock during the Relevant Period.

295.   During the Relevant Period, Defendant McBride was the Chairman and Chief Executive Officer of Stamps.com, and Defendant Huebner was the Company's Co-President and Chief Financial Officer, and subsequently the Company's President. As two of the highest ranking and most highly compensated officers of the Company, they were directly responsible for, and are liable for, all materially false or misleading statements made during the Relevant Period, as alleged above.

296.   As described above, the Section 10(b) Defendants acted with scienter throughout the Relevant Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. Their misstatements and omissions of material facts set forth herein were either known to the Section 10(b) Defendants or were so that the Section 10(b) Defendants should have been aware

of them.  Throughout the Relevant Period, the Section 10(b) Defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

297.   The Section 10(b) Defendants' false or misleading statements and omissions were made in connection with the purchase or sale of the Company's stock, both by the Company itself and by the Insider Seller Defendants (as defined herein).

298.   As a result of the Section 10(b) Defendants' misconduct, Stamps.com has suffered damages in that it paid artificially inflated prices for Stamps.com common stock as part of the repurchase program and suffered losses when the true facts became known. Stamps.com would not have purchased these shares at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by the Section 10(b) Defendants' false or misleading statements.

299.   As a direct and proximate result of the Section 10(b) Defendants' wrongful conduct, the Company suffered damages in connection with its repurchases of Stamps.com common stock during the Relevant Period.  By reason of such conduct, the Section 10(b) Defendants are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5.

300.   This action was brought within two years of the discovery of the facts constituting the violation(s) and within five years of the violation(s) alleged herein.

## COUNT II
### Derivatively Against Defendants McBride, Ananda, Habiger, Jones, Samuels, Huebner, Carberry, Buerba, Clem, Lipson and Khechfe for Violations of Sections 10(b) and 20A of the Exchange Act and Rule 10b-5 Promulgated Thereunder For Insider Trading

301.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

302.   This Count is asserted on behalf of the Company against Defendants McBride, Ananda, Habiger, Jones, Samuels, Huebner, Carberry, Buerba, Clem, Lipson and Khechfe (collectively, the "Insider Seller Defendants") for violations of Sections 10(b) and 20A of the Exchange Act, and Rule 10b-5 promulgated thereunder, for insider trading.

303.   The Insider Seller Defendants, by reason of their relationship with Stamps.com as officers and directors of the Company, had access, directly or indirectly, to material information about the Company not available to the public.

304.   The Insider Seller Defendants knowingly traded on this material, non-public information about the Company.

305.   The Insider Seller Defendants sold Stamps.com securities with actual knowledge that the value of these securities was inflated as a result of the Section 10(b) Defendants' false and misleading statements and other fraudulent activities detailed in this Complaint.

306.   As part of Stamps.com's publicly disclosed share repurchase program, the Company purchased over 2.6 million shares of its common stock throughout the Relevant Period for an aggregate purchase price of more than $327 million. Stamps.com was a contemporaneous purchaser of Stamps.com securities, pursuant to Section 20A of the Exchange Act, when the Insider Seller Defendants sold Stamps.com securities, as set forth in Section IV.F.5.

307.   As a contemporaneous purchaser, Stamps.com was damaged by the actions of the Insider Seller Defendants, as alleged in this Complaint, in that (i) in reliance on the integrity of the market, Stamps.com paid artificially inflated prices as a result of the violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5; and (ii) the Company would not have purchased the securities at the prices it paid, or at all, had it been aware that the market prices had been artificially inflated by Defendants' false or misleading statements.  At the time of the purchase of the securities by Stamps.com, the fair and true market value of the securities was substantially less than the price paid by the Company.

308.   This action was commenced within five years after the Insider Seller Defendants made their sales while in the possession of material non-public adverse information.  By reason of the foregoing, the Insider Selling Defendants violated §§10(b) and 20A of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT III
## Derivatively Against Defendant McBride for Violations of
## Section 20(a) of the Exchange Act

309.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

310.   This Count is asserted on behalf of the Company against Defendant McBride for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

311.   During Defendant McBride's tenure as Chief Executive Officer and Chairman of the Board of Stamps.com, Defendant McBride was a controlling person within the meaning of Section 20(a) of the Exchange Act.  By reason of his absolute control, Defendant McBride had the power and authority to direct the management and activities of the other executive employees, to hire and fire other executive employees at whim, and to cause other executive employees to engage in the wrongful conduct complained of herein.  Defendant McBride was able to and did control, directly or indirectly, the content of the public statements made by all other executive employees at all relevant times, including the materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

312.   In his capacity as senior executive, and Chairman of the Board of Stamps.com, Defendant McBride had direct involvement in and oversight over the

day-to-day operations of the executive employees and the Company's employees, who would not act unless Defendant McBride agreed with their course of conduct.

313.   Defendant McBride, individually, was a controlling person of the other executive employees within the meaning of Section 20(a) of the Exchange Act.

314.   As set forth above, Defendant McBride violated Section 10(b) of the Exchange Act by his acts and omissions as alleged herein. To the extent Defendant McBride is not the maker or disseminator of a specific false or misleading statement made by the Company, he is liable pursuant to Section 20(a) of the Exchange Act.

315.   As a direct and proximate result of Defendant McBride's conduct, the Company suffered damages in connection with its purchase of Stamps.com common stock pursuant to the stock repurchase program.

## COUNT IV
### Derivatively Against the Director Defendants
### For Breach of Fiduciary Duties

316.   Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

317.   The Director Defendants owed and continue to owe fiduciary obligations to Stamps.com and its stockholders.   By reason of their fiduciary

relationships, the Director Defendants owed and owe Stamps.com the highest obligation of good faith, fair dealing, loyalty and due care.

318.    The Director Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

319.    As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, Stamps.com has sustained significant and actual damages, including reputational harm.

320.    As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

321.    Plaintiff, on behalf of Stamps.com, has no adequate remedy at law.

**COUNT V**
**Derivatively Against the Officer Defendants**
**For Breach of Fiduciary Duties**

322.    Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

323.    The Officer Defendants owed and continue to owe fiduciary obligations to Stamps.com and its stockholders.  By reason of their fiduciary relationships, the Officer Defendants owed and owe Stamps.com the highest obligation of good faith, fair dealing, loyalty and due care.

324.   The Officer Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

325.   As a direct and proximate result of the Officer Defendants' failure to perform their fiduciary obligations, Stamps.com has sustained significant and actual damages, including reputational harm.

326.   As a result of the misconduct alleged herein, the Officer Defendants are liable to the Company.

327.   Plaintiff, on behalf of Stamps.com, has no adequate remedy at law.

## COUNT VI
### Derivatively Against Defendants McBride, Ananda, Jones
### And the Officer Defendants for Insider Selling

328.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

329.   Defendants McBride, Ananda, Jones, and the Officer Defendants, by virtue of their position and relationship with Stamps.com, including as officers and/or directors, had access, directly or indirectly, to material information about Stamps.com that was not generally available to the public, as described above, including the true nature and extent of the Company's abusive business practices, USPS complaints and investigations, and the Company's failure to stop the abusive practices.

330.   The information described above was proprietary nonpublic information concerning the Company's abuse of the Reseller Program.  It was a proprietary asset belonging to the Company, which the Defendants used for their own benefit when they sold Stamps.com common stock.

331.   The Defendants' sales of Stamps.com common stock while in possession and control of this material adverse nonpublic information was a breach of their fiduciary duty of loyalty.

332.   Because the use of the Company's proprietary information for their own gain constitutes a breach of the Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Defendants obtained thereby.

## COUNT VII
### Derivatively Against Defendants McBride, Ananda, Jones And the Officer Defendants for Unjust Enrichment

333.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

334.   By their wrongful acts and omissions, Defendants McBride, Ananda, Jones and the Officer Defendants were unjustly enriched at the expense of and to the detriment of Stamps.com in the form of salaries, bonuses, and other forms of compensation they received while breaching their fiduciary duties owed to Stamps.com. Each Defendant approved the Company's stock repurchases and

simultaneously sold their own personal stock holdings for profit, while in possession of material, nonpublic information.

335.   Plaintiff, as a shareholder and representatives of Stamps.com, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

**COUNT VIII**
**Derivatively Against the Director Defendants**
**For Waste of Corporate Assets**

336.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

337.   The Director Defendants owed Stamps.com the obligation to avoid wasting the Company's assets.

338.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused the Company to waste valuable corporate assets by orchestrating and executing the stock repurchase plan in order to advance the interests of their interests at the expense of the Company.

339.   Indeed, the stock repurchases are so one sided that no business person of ordinary, sound judgment could conclude that Stamps.com received adequate value in the transactions.

340.   The Director Defendants breached their obligations to Stamps.com and wasted corporate assets by proposing, approving, and implementing the stock repurchases without proper corporate purpose, resulting in a needless and wasteful use of corporate assets.

341.   As a result of the waste of corporate assets, Stamps.com has been damaged and the Director Defendants are each liable to the Company.

342.   Plaintiff, on behalf of the Company, has no adequate remedy at law.

## X.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays for the following relief:

A.      Determining that this action is a proper derivative action maintainable under the law and demand is excused;

B.      Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

C.      Finding that the Defendants breached their fiduciary duties, have been unjustly enriched, and have engaged in corporate waste;

D.      Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' violations of the Exchange Act, breaches of fiduciary duties, unjust enrichment, and waste of corporate assets;

E.      Against all Defendants and in favor of the Company for extraordinary equitable and injunctive relief as permitted by law and/or equity;

F.      Directing Stamps.com to take all necessary actions to reform and improve its compliance procedures and governance policies to comply with applicable laws and to protect Stamps.com and its stockholders from a repeat of the damaging events described herein;

G.      Awarding Stamps.com restitution from all Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by Defendants;

H.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorney's fees, accountants' and experts' fees, costs, and expenses; and

I.      Granting such other and further relief as the Court deems just and proper.

## XI.   JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury.

DATED: October 8, 2019

LABATON SUCHAROW LLP

**OF COUNSEL:**

_____*/s/ Ned Weinberger*_____
Ned Weinberger (Bar No. 5256)

**HACH ROSE SCHIRRIPA &**
**CHEVERIE LLP**
Daniel B. Rehns
Frank R. Schirripa
112 Madison Avenue, 10th Floor
New York, New York 10016
Tel: (212) 213-8311

Thomas Curry (Bar No. 5877)
300 Delaware Avenue, Suite 1340
Wilmington, DE  19801
Tel: (302) 573-2540

*Counsel for Plaintiff*